[No. 42749-1-I.   Division One.   February 8, 1999.]

SOPHIA CARR, *Respondent*, v. BLUE CROSS OF WASHINGTON AND ALASKA, *Appellant*.

---

942

*Mary H. Spillane* and *Mark S. Davidson* of *Williams, Kastner & Gibbs, P.L.L.C.*, for appellant.
*David A. Summers*, for respondent.

COLEMAN, J. — Blue Cross of Washington and Alaska appeals the trial court's order of summary judgment requiring them to cover Sophia Carr's breast reconstruction fol-

lowing the removal of her ruptured silicone breast implants and contaminated breast tissue. Blue Cross argues that Carr's policy excluded coverage of complications, consequences, and aftereffects of uncovered cosmetic surgery and that this exclusion does not conflict with Washington's statutory mandate that insurers cover breast reconstruction following a mastectomy that results from disease, illness, or injury. *See* RCW 48.44.330.[1] We affirm and find that Carr's procedure was properly classified as a mastectomy and that the occurrence of free silicone which leaked from her ruptured implant resulted in silicone granulomatous disease.

## FACTS

In 1983, Sophia Carr elected to have cosmetic breast enlargement surgery using silicone gel breast implants. Thirteen years later, in December 1996, a mammogram revealed that the implant in her left breast had ruptured. In early 1997, and while a Blue Cross subscriber, Carr consulted with several surgeons who unanimously recommended the removal of both implants as well as the excision of scar tissue that had encapsulated the implants and silicone-contaminated breast tissue. In addition, various procedures for reconstructing Carr's breasts after surgery were discussed.

After obtaining Blue Cross approval for the removal of the implants and contaminated tissue, Dr. Smith performed surgery on both of Carr's breasts on April 29, 1997. Dr. Carr's preoperative diagnosis described Carr's condition as

---

[1]RCW 48.44.330 states:

"(1) Each contract for health care entered into or renewed after July 24, 1983, between a health care services contractor and the person or persons to receive the care shall provide coverage for reconstructive breast surgery resulting from a mastectomy which resulted from disease, illness, or injury.

"(2) Each contract for health care entered into or renewed after January 1, 1986, between a health care services contractor and the person or persons to receive the care shall provide coverage for all stages of one reconstructive breast reduction on the nondiseased breast to make it equal in size with the diseased breast after definitive reconstructive surgery on the diseased breast has been performed."

"[b]ilateral ruptured silicone gel breast implants with extravasation of silicone gel material into left breast with multiple silicone granulomatous disease." Dr. Smith's operative report bears out his diagnosis.

[B]ecause of the extensive extravasation of silicone gel into the breast subcutaneous mastectomy was required. This required tedious dissection of the densely infiltrated breast, approximating the nipple to within .5 cm and requiring resection of approximately two-thirds of the remaining breast tissue.

Blue Cross denied repeated requests from Carr and her physicians to cover reconstruction of Carr's breasts following removal of both implants and contaminated tissue from Carr's left breast on the basis that Carr's insurance plan excluded coverage for cosmetic services and any related procedures. Carr was covered under the "Personal Prudent Buyer Program for Individuals and Families Residing in Washington—EncorePlus 98" plan that excluded coverage for cosmetic services and "[a]ny direct complications, consequences, or aftereffects, whether immediate or delayed, that arise from any condition, service, or supply that is not covered under this Contract, except as specifically stated."

In November 1997, the insurance commissioner responded to Carr's appeal of Blue Cross's denial of coverage and informed Blue Cross that its refusal to cover Carr's reconstructive breast surgery was not supported by the contract and that it fell short of the requirements of Washington law. Blue Cross continued to refuse authorization, and Carr sued Blue Cross on November 21, 1998. Carr moved for summary judgment, claiming that RCW 48.44-.330 required insurers to cover cosmetic and reconstructive services for the involved breast following a mastectomy necessitated by disease, illness, or injury.

Blue Cross opposed summary judgment, claiming that RCW 48.44.330 did not apply because Carr's condition was a condition resulting from cosmetic surgery, not the result of disease, illness, or injury and that the procedure was most accurately described as a lumpectomy or tylectomy,

not a mastectomy. The trial court granted summary judgment in favor of Carr on the issue of coverage and also awarded her attorney fees.

## DISCUSSION

■ In reviewing a grant of summary judgment, the appellate court engages in the same inquiry as the trial court. *Stuart v. American States Ins. Co.*, 134 Wn.2d 814, 818, 953 P.2d 462 (1998). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to summary judgment as a matter of law. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). In addition, interpreting insurance policy language is a question of law and is reviewed de novo. *Mid-Century Ins. Co. v. Henault*, 128 Wn.2d 207, 212, 905 P.2d 379, 59 A.L.R.5TH 789 (1995). Likewise, issues involving statutory construction are also reviewed de novo. *Welch v. Southland Corp.*, 134 Wn.2d 629, 632, 952 P.2d 162 (1998).

■ Blue Cross first argues that its exclusion from coverage of follow-up procedures resulting from cosmetic surgeries is not inconsistent with the statutory requirement that requires insurers to cover breast reconstruction following a mastectomy because the Legislature intended the provision to apply only to mastectomies resulting from cancer. As with any case requiring statutory interpretation, our task is to give effect to the intent and purpose of the Legislature as expressed in the statute. *Welch*, 134 Wn.2d at 633. If the statute is unambiguous then the statute's meaning is derived from its language alone. *Cherry v. Municipality of Metro. Seattle*, 116 Wn.2d 794, 799, 808 P.2d 746 (1991). Only when the meaning of the statute is ambiguous and not plain should this court apply principles of statutory construction to ascertain the Legislature's purpose. A statute that is susceptible to two or more reasonable interpretations is ambiguous. *State v. Sunich*, 76 Wn. App. 202, 206, 884 P.2d 1 (1994). *Morris v. Blaker*, 118 Wn.2d 133, 142-43, 821 P.2d 482 (1992). Terms that are undefined in the statute do not necessarily give rise to am-

biguity. Rather, undefined terms should be given their plain and ordinary meaning unless a contrary legislative intent appears from the wording of the statute itself. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 813, 828 P.2d 549 (1992).

■ Here, the statute requiring insurers to provide for reconstructive breast surgery following a mastectomy which resulted from disease, illness, or injury is not ambiguous. Our task, therefore, is to give the words their ordinary meaning, unless those words are statutorily defined or a contrary legislative intent is evident from the statute itself. Blue Cross argues that the Legislature's intent was to cover breast reconstructions resulting from cancer only. Yet, the statute's wording does not support such a narrow reading. Indeed, the very inclusion of the words "disease, illness, or injury" to describe the causes for which reconstruction following a mastectomy will be covered makes it clear that the Legislature intended to cover more than just cancer-related procedures. Mastectomies resulting from cancer are not normally associated with an injury. Moreover, if the Legislature had intended to limit coverage to reconstruction necessitated by cancer, it would have replaced the broadly descriptive terms "disease, illness, or injury" with the word "cancer." Furthermore, even if we were permitted to look beyond the statute, Blue Cross fails to produce definitive evidence that the Legislature intended to limit coverage to mastectomies resulting from cancer.

Blue Cross also argues that public policy considerations support limiting coverage to cancer-related procedures. According to Blue Cross, insurers should be permitted to exclude procedures necessitated by previous cosmetic procedures because requiring coverage of these procedures would result in increased policy premiums for all policyholders and both health insurers and the general public have an interest in assuring affordable health care premiums. Moreover, Blue Cross contends that most health insurance subscribers would not "want to be required to

bear the burden of another subscriber's decision to have elective cosmetic improvements or of the consequences, no matter how unfortunate, of such a decision." Br. of Appellant, at 21-22.

■ However, the dispute in this case is not about whether insurers must cover medical procedures addressing the complications or aftereffects from an uncovered cosmetic procedure, but whether Carr's condition fulfilled the statutory mandate that her mastectomy resulted from disease, illness, or injury. The insurer, as a private contractor, "is ordinarily permitted to limit its liability unless inconsistent with public policy or some statutory provision." *Mutual of Enumclaw Ins. Co. v. Wiscomb*, 97 Wn.2d 203, 210, 643 P.2d 441 (1982). Thus, an insurer's exclusion will be ineffective if the facts in a specific case fulfill a statutory mandate.

Carr's health insurance policy excluded coverage for cosmetic and reconstructive services, as well as "[a]ny direct complications, consequences, or aftereffects, whether immediate or delayed, that arise from any condition, service, or supply that is not covered under this Contract[.]" Blue Cross argues that the policy's exclusion does not conflict with RCW 48.44.330's mandate to cover breast reconstruction after "a mastectomy which resulted from disease, illness, or injury" because Carr's condition was a natural consequence or complication from breast augmentation using silicone implants. Yet, the statute does not exclude any cause of a mastectomy as long as the cause is properly classified as a disease, illness, or injury. Accordingly, it is possible that a woman's condition could fulfill both the statutory mandate and Blue Cross's exclusion by virtue of developing a disease, illness, or injury as a consequence, complication, or aftereffect of a noncovered procedure.

Because the exclusion criteria of complications, consequences, or aftereffects on the one hand and the statutory criteria of disease, illness, or injury on the other are not mutually exclusive, there will be cases for which the policy

exclusion will be invalid because it is inconsistent with the statute. Thus, instead of a general statement as to whether the reconstructive breast surgery statute applies to all or no situations resulting from failed cosmetic augmentation procedures, a case-by-case inquiry is required to determine if the statute's requirements are met. In short, Blue Cross's policy exclusion is ineffective to the extent that it encompasses situations that also fall within the ambit of RCW 48.44.330.

Blue Cross next argues that reading the statute broadly enough to encompass Carr's situation renders the terms "disease, illness, or injury" meaningless because all breast reconstructions would be covered. This argument exaggerates the effect of RCW 48.44.330. First, coverage is mandated only in the case of a mastectomy. Thus, procedures that are properly classified as something other than a mastectomy are excluded from mandatory coverage. Second, disease, illness, or injury must necessitate the mastectomy. Thus, reconstruction following a cosmetic mastectomy or a prophylactic mastectomy to prevent the onset of breast cancer could be excluded from coverage without violating the statute.

Turning to the facts of this case, Blue Cross argues that removal of Carr's breast implants and contaminated tissue neither rose to the level of a mastectomy nor resulted from disease, illness, or injury. With respect to the definition of mastectomy, Blue Cross contends that total breast removal is required and that Carr's surgery did not remove all her left breast tissue and that it therefore was not a mastectomy. Carr, on the other hand, argues that there are several types of mastectomy that involve removing various amounts of tissue. In support of her contention, Carr refers to a "radical mastectomy" which involves excision of pectoral muscle tissue as well as breast tissue, a "modified radical mastectomy" which preserves the pectoral muscle but excises all or virtually all the breast tissue, and a "subcutaneous mastectomy" which does not excise some of the subcutaneous fatty tissue. Thus, according to Carr,

since the statute does not differentiate between the types of mastectomies, it must be read to include all types of mastectomies.

Both parties provide dictionary definitions that support their respective interpretations of the word "mastectomy." According to Blue Cross, the AMERICAN HERITAGE DICTIONARY defines mastectomy as the "surgical removal of a breast." AMERICAN HERITAGE DICTIONARY at 770 (2d Coll. ed. 1985). However, Carr cites five references that do not limit the definition of mastectomy to the total removal of the breast. For example, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY defines "mastectomy" as the "excision or amputation of the breast." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 1389 (1969). Excision is defined as the surgical removal (as of a diseased part), and amputate is defined as "to cut off (a limb or portion of a limb or a projecting part of the body)." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 792, 74 (1969). Thus, according to Webster's, cutting off a portion of a breast would still be considered a mastectomy. Carr also cites to a definition from the 1992 edition of the AMERICAN HERITAGE DICTIONARY, the same publisher of the 1985 edition dictionary referenced by Blue Cross, which purportedly expands upon the 1985 definition of mastectomy to include the "surgical removal of all or part of a breast. . . ."

In reply, Blue Cross cites authority that directs courts to resort to principles of statutory construction when dictionaries yield inconclusive results. *Zachman v. Whirlpool Fin. Corp.*, 123 Wn.2d 667, 671, 869 P.2d 1078 (1994). Blue Cross then invokes the statutory construction principles of looking to the content of subsequent amendments to the statute in question and related statutes when dictionary definitions are not dispositive. *See Rozner v. Bellevue*, 116 Wn.2d 342, 347, 804 P.2d 24 (1991); *Harmon v. Department of Soc. & Health Servs.*, 134 Wn.2d 523, 530, 951 P.2d 770 (1998). With these principles in mind, Blue Cross argues that the Legislature intended the word "mastectomy" to cover only complete breast removal because the section fol-

lowing RCW 48.44.330 distinguishes between mastectomies and lumpectomies. *See* RCW 48.44.335.[2] Thus, Blue Cross argues the Legislature must have used mastectomy to describe the complete removal of a breast because had they considered lumpectomies to be a subset of mastectomies, there would have been no need to expressly include lumpectomies in RCW 48.44.335. This argument is persuasive only if all procedures that remove less than the entire breast are considered lumpectomies. Unfortunately for Blue Cross, this is not the case. Rather, a lumpectomy is best described as one type of a partial mastectomy.

Moreover, because the purpose of RCW 48.44.330 is different from that of RCW 48.44.335, the inclusion of lumpectomy in RCW 48.44.335 does not require limiting the definition of mastectomy to the complete removal of a breast. The purpose of RCW 48.44.335 is to ensure availability of medical insurance coverage for women where the risk of reoccurrence of the condition that necessitated the mastectomy or lumpectomy is low due to the passage of five years since surgery. The purpose of the statute involved in this case appears to be aimed at "enhanc[ing] the patient's psychological and physical recovery." H.B. Rep. SSB 3197, at 2 (Wash. 1983).

Thus, the purpose of mandating coverage for reconstructive surgery is therefore met whenever the surgical procedure necessitated by disease, illness, or injury removes sufficient tissue to necessitate reconstruction. Limiting reconstruction to only those situations involving complete removal of the breast would reduce the effectiveness of the statute and would create an arbitrary demarcation between coverage and no coverage. Furthermore, the purposes of

---

[2]"No health care service contractor under this chapter may refuse to issue any contract or cancel or decline to renew the contract solely because of a mastectomy or lumpectomy performed on the insured or prospective insured more than five years previously. The amount of benefits payable, or any term, rate, condition, or type of coverage shall not be restricted, modified, excluded, increased, or reduced solely on the basis of a mastectomy or lumpectomy performed on the insured or prospective insured more than five years previously." RCW 48.44.335.

both statutes are achieved if a lumpectomy is simply considered one type of a partial mastectomy where the results are not severe enough to require reconstruction. We find that the word "mastectomy" in RCW 48.44.330 includes partial mastectomies where the patient's breast is left substantially deformed and a licensed physician determines that reconstruction is necessary for the patient's complete recovery.

Next, Blue Cross argues that the partial mastectomy performed on Carr was not the result of disease, illness, or injury, but was simply the consequence and aftereffect of the failure of her 1983 cosmetic breast augmentation. According to Blue Cross, the failure of Carr's breast implant and leakage of silicone into her surrounding breast tissue was not a disease, illness, or injury. Instead, Blue Cross argues that the encapsulation of the migrating silicone is the human body's natural response to the presence of a foreign substance.

In support of its position, Blue Cross again relies on dictionary definitions. After defining the terms "disease," "illness," and "injury," Blue Cross summarily concludes that Carr's condition did not satisfy any of these definitions. For example, Blue Cross claims that Carr's condition was not a disease because disease is defined as "[a]n abnormal condition of an organism or part, [especially] as a consequence of infection, inherent weakness, or environmental stress, that impairs normal physiological functioning," and Carr suffered only from "recognized complications and natural consequences of failed voluntarily placed cosmetic silicone gel breast implants." Br. of Appellant, at 32 (quoting AMERICAN HERITAGE DICTIONARY 404 (2d Coll. ed. 1985)). Again, Blue Cross takes the approach that a recognized complication or natural consequence of a medical procedure cannot also be classified as a disease, illness, or injury. Yet, Blue Cross fails to explain why these two concepts are mutually exclusive. Furthermore, Blue Cross's conclusion glosses over the medical reports that described Carr's left breast as having suffered injury when the silicone gel implant

ruptured and that Carr's breast was diseased due to extra-capsular migration of silicone gel which formed silicone granulomas.

Indeed, even using Blue Cross's supplied dictionary definitions, it appears that Carr's condition is properly classified as a disease or illness. Her body's response in encapsulating the free silicone that leaked from the ruptured implant was a response to the environmental stress of the unintended introduction of a foreign material, the leaked silicone, into her breast. In fact, Carr points out that "granuloma" is medically defined as "[a]ny one of a rather large group of fairly distinctive focal lesions that . . . are formed as a result of inflammatory reactions caused by biologic, chemical or physical agents[.]" Br. of Resp't, at 38-39 (citing STEDMAN'S MEDICAL DICTIONARY 537). Moreover, the migration of silicone into Carr's breasts and the potential for continued migration impaired her body's normal physiological functioning, i.e., the normal and healthy functioning of her body, as evidenced by the pain in her breast and her body's response to the foreign material.

Similarly, Blue Cross argues that Carr's granulomas cannot be considered an illness because illness is defined as a sickness of the body or mind or poor health, and Carr's condition did not render her body or mind sick. However, the undisputed evidence reveals that Carr continually experienced pain in her breast and that her breast tissue was not healthy. We find that this is sufficient to constitute an illness.

Finally, Blue Cross argues that even if this court finds that the statute encompasses partial mastectomies and applies to the consequences, complications, and aftereffects of cosmetic surgeries, there are genuine issues of material fact in this case that preclude summary judgment. In support of this argument, Blue Cross relies on the statements of their medical expert, Dr. Grauman, that mastectomies must involve the intent to remove all breast tissue and that anything less would be considered a lumpectomy or

tylectomy. However, Dr. Grauman's expert opinion is not authoritative on the legal definition of mastectomy as used in RCW 48.44.330. *See Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 814, 828 P.2d 549 (1992) (stating that the meaning of a statute's term is a question of law and is therefore not amenable to resolution based on trial testimony). As previously discussed, we find as a matter of law that "mastectomy" as used in RCW 48.44.330 includes a partial mastectomy that leaves the breast deformed to a degree that a licensed physician deems that reconstruction is medically necessary for the patient's complete recovery.

Blue Cross also argues that it raised genuine issues about whether Carr's surgery resulted from disease, injury, or illness by the introduction of Dr. Grauman's statement that "[t]he existence of silicone in the breast would not seem to be the equivalent of 'disease, injury or illness.' " Yet, as pointed out by Carr, the issue is not whether the general occurrence of silicone in the breast is equivalent to a disease, injury, or illness, but rather if the occurrence of silicone in Carr's breast injured her breast tissue or resulted in the diseased condition of silicone granulomas. The facts in this case are undisputed that Carr's body reacted unfavorably to the presence of silicone in her breast tissue, and summary judgment was therefore appropriate.

Attorney fees

██ ██ Attorney fees are required to be awarded when an insurer compels the insured to pursue a legal action in order to obtain the full benefit of the insurance contract. *McGreevy v. Oregon Mut. Ins. Co.*, 128 Wn.2d 26, 33, 904 P.2d 731 (1995); *Olympic S.S. Co. v. Centennial Ins. Co.*, 117 Wn.2d 37, 53, 811 P.2d 673 (1991). Carr asks for attorney fees on appeal pursuant to RAP 18.1(a), which authorizes an award of fees on appeal if "applicable law grants to a party the right to recover reasonable attorney fees." Carr is therefore awarded reasonable attorney fees on appeal.

Affirmed.

WEBSTER and APPELWICK, JJ., concur.