## NOTICE: SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE OCT 0 9 2014

*Madsen, C.J.*
CHIEF JUSTICE

This opinion was filed for record
at 8:00AM on Oct. 9 2014

Ronald R. Carpenter
Supreme Court Clerk

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| O.S.T, by and through his parents, G.T. and E.S.; and L.H., by and through his parents, M.S. and K.H., each on his own behalf and on behalf of all similarly situated individuals, ) ) ) ) ) ) | No. 88940-6 |
| Respondents, ) ) | En Banc |
| v. ) ) | Filed OCT 0 9 2014 |
| REGENCE BLUESHIELD, a Washington corporation, ) ) ) | |
| Appellant. ) ) | |

WIGGINS, J.—Today's controversy arises from the enactment of two laws: the neurodevelopmental therapies mandate, RCW 48.44.450, and the mental health parity act, RCW 48.44.341. In 1989, the Washington Legislature mandated coverage for neurodevelopmental therapies (neurodevelopmental therapies or NDT) (speech, occupational, and physical therapy) in employer-sponsored group plans for children under age seven (the neurodevelopmental therapies mandate or NDT mandate). RCW 48.44.450. In 2005, the legislature enacted the mental health parity act, which mandates coverage for "mental health services." RCW 48.44.341. We hold that the statutes do not conflict—neurodevelopmental therapies may constitute "mental health services" if the therapies are medically necessary to treat a mental

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

disorder identified in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (4th rev. ed. 2000) (*DSM-IV-TR*). Therefore, the blanket exclusions of neurodevelopmental therapies in the plaintiffs' health contracts are void and unenforceable.

## FACTS

The two named plaintiffs in this case are O.S.T. and L.H. O.S.T. was six years old at the time this law suit commenced. When he was just six months old, he began having difficulties feeding and was diagnosed with a feeding disorder. Problems with O.S.T.'s health worsened as he got older. "He went from having normal language development to nearly no language at all." By his third birthday, therapists believed that O.S.T. was autistic. Between 2006 and 2008 he received speech, physical, and occupational therapy from Boyer Children's Clinic.[1] After leaving the Boyer Children's Clinic, he continued to receive neurodevelopmental therapies from Children's Communication Corner; the Hearing, Speech and Deafness Center; and Seattle Children's Hospital. In 2009, the autism diagnosis was confirmed following an evaluation with Seattle Children's Hospital.

The second named plaintiff, L.H., was two years old when this suit began. He is diagnosed with expressive language disorder, myotubular myopathy, profound hypotonia, and severe hydrocephalus. He receives speech, occupational, and physical therapy from Boyer Children's Clinic.

---

[1] These therapies were subsidized by the Boyer Children's Clinic. At the age of three, O.S.T. was no longer eligible for the subsidy.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Both plaintiffs either are or have been insured under health policies issued by Regence BlueShield that contain blanket exclusions for neurodevelopmental therapies. Regence BlueShield did not cover O.S.T.'s therapies, so O.S.T.'s parents paid for the services. It is unclear whether Regence BlueShield denied any of L.H.'s claims.

The plaintiffs filed a class-action complaint, alleging breach of contract; declaratory relief; violation of the Washington Consumer Protection Act, chapter 19.86 RCW; and seeking injunctive relief. Judge Erlick granted partial summary judgment to the plaintiffs on December 12, 2012. He held that "any provisions contained in Regence BlueShield policies issued and delivered to Plaintiffs O.S.T. and L.H. on or after January 1, 2008[2] that exclude coverage of neurodevelopmental therapies regardless of medical necessity are declared invalid, void and unenforceable by Defendant and its agents." He further certified the order for interlocutory review under RAP 2.3(b)(4). The Court of Appeals granted discretionary review, and we accepted transfer.

## ANALYSIS

We hold the neurodevelopmental therapies mandate and the mental health parity act do not conflict. The mental health parity act requires insurers to provide NDT coverage in individual plans when the therapies are medically necessary to

---

2      This is the date the mental health parity act became applicable to individual health plans. *See* LAWS OF 2007, ch. 8, § 1.

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

treat mental disorders recognized in the *DSM-IV-TR* if the insurance contract covers

medical and surgical services.[3] We also affirm the trial court's order granting partial

summary judgment.

## A. Standard of Review

We review matters of statutory interpretation de novo. *Dep't of Ecology v.*

*Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). We use that same

standard to review grants of summary judgment. *Camicia v. Howard S. Wright*

*Constr. Co.*, 179 Wn.2d 684, 693, 317 P.3d 987 (2014).

## B. Statutory Interpretation

Our fundamental goal in statutory interpretation is to "discern and implement

the legislature's intent." *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201

(2007). If a statute's meaning is plain on its face, we "give effect to that plain meaning

as an expression of legislative intent." *Campbell & Gwinn, LLC*, 146 Wn.2d at 9-10.

We derive the plain meaning from the language of the statute and related statutes.

*Id.* "When the plain language is unambiguous—that is, when the statutory language

admits of only one meaning—the legislative intent is apparent, and we will not

construe the statute otherwise." *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318

---

[3] Regence BlueShield argues that there is no justiciable issue before the court, so a declaratory judgment would be inappropriate. We reject this argument. O.S.T and L.H. are both diagnosed with mental disorders recognized in the *DSM-IV-TR*, Regence BlueShield insures both of them on individual plans, both of their contracts contain blanket exclusions for neurodevelopmental therapies, and both need neurodevelopmental therapies. Regence BlueShield has denied coverage to O.S.T. While Regence BlueShield has not denied claims for L.H., the risk of it doing so is more than merely hypothetical or speculative. *Diversified Indus. Dev. Corp. v. Ripley*, 82 Wn.2d 811, 814-15, 514 P.2d 137 (1973).

*O.S.T. by and through his parents, G.T. and E.S. et al.*
*v. Regence Blueshield*, No. 88940-6

(2003). However, when the statute is ambiguous or there are conflicting provisions, "we may arrive at the legislature's intent by applying recognized principles of statutory construction." *Id.*

We begin with an analysis of the plain language of the NDT mandate. The legislature passed the mandate in 1989. LAWS OF 1989, ch. 345; RCW 48.44.450. It provides:

> (1) Each *employer-sponsored* group contract for comprehensive health care service[s] . . . shall include coverage for neurodevelopmental therapies for covered individuals age six and under.
>
> (2) Benefits provided under this section shall cover the services of those authorized to deliver occupational therapy, speech therapy, and physical therapy. . . .
>
> (3) Benefits provided under this section shall be for medically necessary services as determined by the health care service contractor. Benefits shall be payable for services for the maintenance of a covered individual in cases where significant deterioration in the patient's condition would result without the service. Benefits shall be payable to restore and improve function.

RCW 48.44.450 (emphasis added).

The plain language of the mandate suggests legislative intent to expand coverage for therapies, but to do so in a limited way. It mandated expanded coverage only for group insurance plans and, within those plans, only for children under age seven. *Id.*

Sixteen years later, the legislature enacted another mandate, which requires health insurers to provide coverage for "mental health services." *See* RCW 48.44.341. The legislature passed the mandate after finding that the cost of leaving

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

mental disorders untreated is significant. *See* LAWS OF 2005, ch. 6, § 1. Costs include:

> [d]ecreased job productivity, loss of employment, increased disability costs, deteriorating school performance, increased use of other health services, treatment delays leading to more costly treatments, suicide, family breakdown and impoverishment, and institutionalization, whether in hospitals, juvenile detention, jails, or prisons.

*Id.*[4]

The mental health parity act provides:

> (2)   All health service contracts providing health benefit plans that provide coverage for medical and surgical services shall provide:
>
>   . . . .
>
> (b)   For all health benefit plans[5] delivered . . . on or after January 1, 2008, coverage for:

---

[4] The legislature also found:

> Treatable mental disorders are prevalent and often have high impact on health and productive life. The legislature finds that the potential benefits of improved access to mental health services are significant. Additionally, the legislature declares that it is not cost-effective to treat persons with mental disorders differently than persons with medical and surgical disorders.
>
> Therefore, the legislature intends to require that insurance coverage be at parity for mental health services, which means this coverage be delivered under the same terms and conditions as medical and surgical services.

*Id.*

[5] Originally, the mental health parity act covered only group health benefit plans for groups of more than 50 employees. LAWS OF 2005, ch. 6, § 4. However, in 2007, the legislature expanded the scope of the mental health parity act to cover all health benefit plans. LAWS OF 2007, ch. 8, § 3.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

      (i)    Mental health services[6] . . . .

RCW 48.44.341. The legislature defined "mental health services" as "medically necessary outpatient and inpatient services provided to treat mental disorders covered by the diagnostic categories listed in the most current version of the diagnostic and statistical manual of disorders . . . ." RCW 48.44.341(1).[7]

The language of the mental health parity act evidences legislative intent to require health insurers to cover treatment for mental health disorders and to do so in parity with the medical and surgical services it covers. Expressive language disorder and autistic disorder are mental disorders recognized in the *DSM-IV-TR* at pages 58-61 and 70-75. By the plain language of the mental health parity act, the legislature did not create an exception for autism (or expressive language disorder) or the neurodevelopmental therapies that treat these disorders. *See* RCW 48.44.341(1). Therefore, under the language of the statute, the mental health parity

---

[6] RCW 48.44.341(2)(i) continues:

> The copayment or coinsurance for mental health services may be no more than the copayment or coinsurance for medical and surgical services otherwise provided under the health benefit plan. Wellness and preventive services that are provided or reimbursed at a lesser copayment, coinsurance, or other cost sharing than other medical and surgical services are excluded from this comparison. If the health benefit plan imposes a maximum out-of-pocket limit or stop loss, it shall be a single limit or stop loss for medical, surgical, and mental health services . . . .

[7] The legislature expressly excluded certain services from the definition of "mental health services." *See* RCW 48.44.341(1) ("(a) Substance related disorders; (b) life transition problems . . . ; (c) skilled nursing facility services, home health care, residential treatment, and custodial care; and (d) court ordered treatment unless the health care service contractor's medical director or designee determines the treatment to be medically necessary").

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

act requires coverage for medically necessary neurodevelopmental therapies if they are used to treat a mental disorder recognized in the *DSM-IV-TR*.

The NDT mandate and mental health parity act are unambiguous and do not conflict.[8] The scope of each is different. One statute addresses neurodevelopmental therapies generally and does not require that they be used to treat a mental disorder recognized in the *DSM-IV-TR*. *See* RCW 48.44.450. The other broadly mandates coverage for all medically necessary treatment for mental disorders recognized in the *DSM-IV-TR*, except as expressly excluded (provided the contract covers medical and surgical services). *See* RCW 48.44.341(1), (2).

Under the plain language of the statute, we conclude that the NDT mandate creates a minimum level of required coverage for neurodevelopmental therapies. However, when neurodevelopmental therapies are medically necessary to treat mental disorders in the *DSM-IV-TR*, the mental health parity act requires additional coverage. Insurers must meet the requirements of both acts.[9]

---

[8] Because the statutory language is unambiguous, we find it unnecessary to inquire into legislative history or failed, subsequent bills. *See Campbell & Gwinn, LLC*, 146 Wn.2d at 12.

[9] Regence BlueShield asks us to attach significance to the fact that the Washington State Office of the Insurance Commissioner (OIC) has never disapproved Regence BlueShield's NDT exclusion. We decline to do so. Assuming that this constitutes an agency interpretation, we afford the agency interpretation deference only if the interpretation is not contrary to the plain language of the statute. *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 612, 90 P.3d 659 (2004). According to the plain language of the mental health parity act, insurers must provide coverage for mental health services, including neurodevelopmental therapies, if they are medically necessary to treat mental disorders recognized in the *DSM-IV-TR*. RCW 48.44.341. Regence BlueShield's exclusion was contrary to the plain language of the mental health parity act, and OIC's action (or inaction) is irrelevant.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

C.    Regence BlueShield's Arguments

Regence BlueShield makes several failing arguments.  It first argues that neurodevelopmental therapies are an exception to the mental health parity act.  It arrives at this conclusion using the statutory maxim expressio unius est exclusio alterius. Applying this maxim, Regence BlueShield argues that the NDT mandate has both positive and negative requirements.  The positive is that employer-sponsored plans must provide NDT coverage to children through age six.  *See* RCW 48.44.450(1).  The negative is that no employer-sponsored plan is required to cover NDT to children over age six, and no other health plan is required to provide NDT benefits.  *See* RCW 48.44.450(1).  Under this interpretation, Regence BlueShield argues that the two statutes conflict—the mental health parity act requires coverage not required by the NDT mandate.  Regence BlueShield concludes that the NDT mandate is the more specific statute and, therefore, controls.  Consequently, O.S.T. and L.H. are not entitled to coverage.

Regence BlueShield's argument is unpersuasive.  It would make sense to apply the maxim expressio unius est exclusio alterius if the statutory language was ambiguous and the legislature never had enacted the mental health parity act.  However, once the legislature passed the mental health parity act, the statute requires coverage regardless of the NDT mandate. The statutory maxim is subordinate to the primary rule of statutory interpretation, which is to follow legislative intent.  *See De Grief v. City of Seattle*, 50 Wn.2d 1, 12, 297 P.2d 940 (1956).  The

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

legislature's clear intent is to require coverage for all medically necessary services that treat mental disorders.

Regence BlueShield's reliance on the general-specific rule of statutory interpretation is also misplaced. We will not apply the rule because the statutes do not conflict. The rule of statutory construction applies only if, after attempting to read statutes governing the same subject matter in pari materia, we conclude that the statutes conflict to the extent they cannot be harmonized. *In re Estate of Kerr*, 134 Wn.2d 328, 343, 949 P.2d 810 (1998); *Residents Opposed to Kittitas Turbines v. State Energy Facility Site Evaluation Council*, 165 Wn.2d 275, 308-10, 197 P.3d 1153, 1170 (2008) (*EFSEC*). Under the principle of statutory construction, the specific statute prevails over a general statute. *Kerr*, 134 Wn.2d at 343; *EFSEC*, 165 Wn.2d at 308-310. In situations where the legislature enacts a general statute after a specific statute, we construe "the original specific statute as an exception to the general statute, unless expressly repealed." *EFSEC*, 165 Wn.2d at 309. The statutes do not conflict, so there is no need to apply the rule of statutory construction.

Second, Regence BlueShield argues that our interpretation of the mental health parity act constitutes an implicit repeal. "Repeal by implication occurs when an act not purporting to repeal any prior act is wholly or partially inconsistent with a prior statute . . . ." 1A NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 22:22, at 320-21 (7th ed. 2007). We disfavor repeals by implication, and will not find repeal by implication "where earlier and later statutes may logically stand side by side and be held valid." *Bellevue Sch. Dist. No. 405 v.*

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Brazier Constr. Co.*, 103 Wn.2d 111, 123, 691 P.2d 178 (1984); see *Tardiff v. Shoreline Sch. Dist.*, 68 Wn.2d 164, 166, 411 P.2d 889 (1966); *Our Lady of Lourdes Hosp. v. Franklin County*, 120 Wn.2d 439, 450, 842 P.2d 956 (1993) ("Under the 2-pronged test for such repealer, the later act must cover the entire subject matter of the earlier legislation, be complete in itself, and be intended to supersede prior legislation on the subject; and the two acts must be so clearly inconsistent and so repugnant to each other that they cannot be reconciled."). "Where an amendment may be harmonized with the existing provisions and purposes of a statutory scheme, there is no implicit repeal." *Gilbert v. Sacred Heart Med. Ctr.*, 127 Wn.2d 370, 375, 900 P.2d 552 (1995); see 1A SUTHERLAND STATUTORY CONSTRUCTION, *supra*, § 23:9, at 468-69 ("[I]f the inconsistency between a later act and an earlier one is not fatal to the operation of either, the two may stand together and no repeal is effected.").

Here, the statutes may stand side by side and fulfill their respective purposes. The NDT mandate changed common law. Insurers may limit their liability, unless the exclusion is inconsistent with public policy or a statutory mandate. *Carr v. Blue Cross of Wash. & Alaska*, 93 Wn. App. 941, 948, 971 P.2d 102 (1999). By enacting the NDT mandate, the legislature changed the law as applied to employer-sponsored plans for children under age seven, thus setting the floor on required coverage concerning employer-sponsored plans. Almost two decades later, the legislature added another coverage mandate—this time requiring parity for mental health services. The effect of the later statute does not nullify the effects of the former. The express language of the NDT mandate simply requires coverage for group plans with

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

children under age seven. The mental health parity act created a different floor for medically necessary treatments for mental disorders. Therefore, the mental health parity act does not implicitly repeal the NDT mandate.

Finally, Regence BlueShield argues that because "providers of neurodevelopmental therapies—occupational, speech, and physical therapists— may not provide mental-health services, those therapies cannot be considered mental-health services, and the [mental health] Parity Act does not apply." Appellant Regence BlueShield's Opening Br. at 18. It reaches this conclusion by exporting from another chapter of the statute the definition of "mental health care practitioners." *See* RCW 48.43.087. Regence BlueShield's reasoning is flawed. The definition was only "for purposes of [the] section" of the statute that allows insurance enrollees to agree to contract for other services at their own expense. RCW 48.43.087(1)(c), (2). An additional red flag is that RCW 48.43.087(1)(d) provides a definition for "mental health services" that is different from the one provided in the mental health parity act. Clearly, the definitions in RCW 48.43.087 do not apply to the mental health parity act.

## D. Summary Judgment

Having interpreted the statutes, we now analyze whether the trial court properly granted summary judgment. Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c). We grant motions only if reasonable people could reach one conclusion based on the evidence when viewing the facts in

the light most favorable to the nonmoving party. *Korslund v. DynCorp Tri-Cities Servs., Inc.*, 156 Wn.2d 168, 177, 125 P.3d 119 (2005). Here, the trial court appropriately granted summary judgment on the declaratory judgment claim.

Under the Uniform Declaratory Judgments Act, chapter 7.24 RCW, "[c]ourts of record within their respective jurisdictions shall have power to declare rights, status and other legal relations whether or not further relief is or could be claimed." RCW 7.24.010. "A person interested under a deed, will, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute [or] contract . . . may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder." RCW 7.24.020. Here, the plaintiffs ask the court to determine the validity of a provision in their health contracts under Washington law.

Under the mental health parity act, all health benefit plans must provide coverage for "mental health services" if they provide coverage for medical and surgical services. RCW 48.44.341(2)(c). Neurodevelopmental therapies qualify as "mental health services" if they are medically necessary to treat a mental disorder covered by the *DSM-IV-TR*. RCW 48.44.341.

Regence BlueShield is a health care service contractor, it entered into contracts with O.S.T. and L.H. for individual policies, and neither party questions that the plans provide coverage for medical and surgical services. The plans contain a blanket exclusion for all neurodevelopmental therapies, meaning that the plans

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

exclude therapies regardless of whether they are medically necessary. Therefore,

the blanket exclusion violates the mental health parity act if neurodevelopmental

therapies may be medically necessary to treat mental disorders.

"Medically necessary" is defined under Regence BlueShield contracts:

MEDICALLY NECESSARY: Means health care services or supplies that a Physician or other health care provider exercising prudent clinical judgment, would provide to a Member for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its *symptoms* and that are:

1.17.1 In accordance with generally accepted standards of medical practice;

1.17.2 Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the Member's illness, injury or disease; and

1.17.3 Not primarily for the convenience of the Member, Physician or other health care provider, and not more costly than an alternative service or sequence of services, or supply at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the Member's illness, injury or disease.

For these purposes, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, Physician Specialty Society recommendations and the views of Physicians practicing in relevant clinical areas and any other relevant factors.

(Emphasis added.)

Regence BlueShield argues that there is a genuine issue of material fact

concerning whether neurodevelopmental therapies may be "medically necessary."

However, there is no real disagreement that neurodevelopmental therapies meet the

definition of "medically necessary" in Regence BlueShield's own contract. By the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

terms of the contract, a service may be "medically necessary" if it treats the symptoms of a disease or illness (and meets other enumerated qualifications). The service does not need to cure the illness; it is sufficient to treat the symptoms of the illness.

The executive medical director at Regence BlueShield, Dr. Joseph Gifford, recognizes, "[Autism Spectrum Disorder (ASD)] is a complex disorder, the exact cause of which is unknown. Most services are focused on improving physical, social, and functional problems that impact the functional status of individuals."[10]

The plaintiffs submitted declarations from Dr. Charles Cowan, the medical director of Seattle Children's Hospital Autism Center and a clinical professor in pediatrics and psychiatry at the University of Washington School of Medicine. He states:

> Neurodevelopmental therapies (such as speech, occupational, and physical therapies) are a critical component of treating autism. Often, these therapies are the only specialized medical interventions provided to young children with autism. In Washington [S]tate, it is a standard medical practice to have young children suspected of having autism evaluated by neurodevelopmental therapists, and if such evaluations reveal significant delays, treated with speech, occupational and physical therapy.

Dr. Cowan additionally states:

> [T]he medical community has embraced the conclusion that neurodevelopmental therapies treat ASD as well as many other developmental disorders. Like insulin therapy for diabetics, neurodevelopmental therapies address the fundamental symptoms of

---

[10] Dr. Gifford also states that neurodevelopmental therapies do not actually treat the autism. He does not consider treatment to include services that improve the function of the beneficiary. However, such services meet Regence BlueShield's definition of "medically necessary."

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

the conditions and can dramatically improve those symptoms. The purpose of neurodevelopmental therapies . . . is to attempt to restore a child's functional capacity to develop in a manner more consistent with the normal pattern of human development. With these therapeutic interventions, a child with ASD may be restored to the normal curve of developmental milestones, or as near normal as possible.

Despite Regence BlueShield's contention, there is no genuine issue preventing summary judgment—reasonable minds could not differ when viewing the evidence in the light most favorable to the defendant. Neurodevelopmental therapies may be medically necessary under Regence BlueShield's broad definition of the term because neurodevelopmental therapies treat the symptoms of autism (a mental disorder recognized in the *DSM-IV-TR*). Therefore, blanket exclusion of these therapies violates the mental health parity act.

## CONCLUSION

We affirm the trial court's order of partial summary judgment. Regence BlueShield's blanket exclusion of neurodevelopmental therapies in its individual policies violates the mental health parity act. If neurodevelopmental therapies are medically necessary to treat mental disorders (and the contract provides coverage for medical and surgical services), Regence BlueShield must provide coverage for the therapies. The exclusion is void and invalid as a matter of Washington law.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*O.S.T. by and through his parents, G.T. and E.S. et al.*
*v. Regence Blueshield*, No. 88940-6

Wiggins, J.

WE CONCUR.

Madsen, C.J.

Stephens, J.

González, J.

Fairhurst, J.

Gordon McCloud, J.

Yu, J.

17