**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
DECEMBER 21, 2023

*González C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
DECEMBER 21, 2023

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| P.E.L.; and P.L. and J.L., a married couple and parents of P.E.L., | ) ) ) | No. 101561-5 |
| Respondents, | ) ) ) | En Banc |
| v. | ) ) | |
| PREMERA BLUE CROSS, | ) ) | Filed: <u>December 21, 2023</u> |
| Petitioner. | ) ) ) | |

YU, J. — This case concerns a health insurer's alleged violation of mental health parity laws. Broadly speaking, "parity laws" require health insurance plans to provide equal coverage for mental health and substance use disorder services as compared to other medical and surgical services.

In early 2016, plaintiff P.E.L. experienced severe mental health symptoms requiring inpatient hospitalization. Following her release from the hospital, P.E.L. spent two months in the Evoke at Cascades Wilderness Program (Evoke) before transitioning to long-term residential treatment. The parties dispute whether P.E.L.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

is entitled to health insurance coverage for Evoke. At all relevant times, P.E.L.

was a beneficiary of her parents' (plaintiffs P.L. and J.L.) health insurance plan,

which was issued by defendant Premera Blue Cross. The plan covers "residential

treatment" for mental health conditions. Clerk's Papers (CP) at 110. However,

Premera denied coverage for Evoke based on a specific exclusion for "[o]utward

bound, wilderness, camping or tall ship programs or activities" (the wilderness

exclusion). *Id.* at 112.

The plaintiffs sued Premera, alleging that the wilderness exclusion violates

federal and state parity laws. The trial court dismissed the suit on summary

judgment, but the Court of Appeals reversed in part, partially reinstating the

plaintiffs' claims for breach of contract, insurance bad faith, and violation of the

Consumer Protection Act (CPA), ch. 19.86 RCW. *P.E.L. v. Premera Blue Cross*,

24 Wn. App. 2d 487, 520 P.3d 486 (2022). We reverse in part and affirm in part.

Premera is entitled to summary judgment on the plaintiffs' breach of

contract action. The plaintiffs assert claims based on both federal and state parity

laws. However, they do not show that a violation of *federal* parity law gives rise to

a viable common law action for breach of contract. Violations of *state* parity laws

are actionable in contract, but the specific state parity claim in this case cannot

succeed given the statutory language in effect during the relevant time period. We

*P.E.L., P.L. & J.L. v. Premera Blue Cross,* No. 101561-5

therefore reverse the Court of Appeals in part and remand the plaintiffs' breach of contract action to the trial court for dismissal.

Nevertheless, we affirm the Court of Appeals' holding that the plaintiffs are not required to produce evidence of objective symptomatology to support their insurance bad faith claim for emotional distress damages. Therefore, we remand the insurance bad faith and CPA actions to the trial court for further proceedings.[1]

OVERVIEW OF MENTAL HEALTH PARITY LAWS

Because mental health parity laws are rarely addressed in Washington appellate opinions, it is necessary to begin with a brief overview.

A. General background on federal health insurance law

In the United States, private health insurance coverage is generally divided into "three market segments: individual, small group, or large group." U.S. Gov't Accountability Off., GAO-20-150, Mental Health and Substance Use: State and Federal Oversight of Compliance with Parity Requirements Varies 6 (Dec. 2019) [hereinafter GAO-20-150] [https://perma.cc/MS7L-RQCA]. The "individual" market refers to those who "purchase private health insurance

---

[1] The Court of Appeals "reverse[d] dismissal of the CPA claim" based on its decision partially reinstating the breach of contract action. *P.E.L.*, 24 Wn. App. 2d at 509 n.22. Although we hold the breach of contract action was properly dismissed, "an insured may maintain an action against its insurer for bad faith investigation of the insured's claim *and violation of the CPA* regardless of whether the insurer was ultimately correct in determining coverage did not exist." *Coventry Assocs. v. Am. States Ins. Co.*, 136 Wn.2d 269, 279, 961 P.2d 933 (1998) (emphasis added). We therefore remand both the insurance bad faith action and the CPA action for further proceedings.

3

*P.E.L., P.L. & J.L. v. Premera Blue Cross,* No. 101561-5

plans directly from a state-regulated issuer." *Id.* The "group" market refers to those who "obtain health insurance coverage through a group health plan offered through a plan sponsor (typically an employer)." *Id.*

Different market segments are subject to different federal laws. For instance, health insurance plans sponsored by private employers in the "large group" market are subject to ERISA (the Employee Retirement Income Security Act of 1974, Pub. L. No. 93-406, 88 Stat. 829). The plaintiffs in this case are in the "individual" market because they purchased their health insurance plan directly from Premera on the Washington Health Benefit Exchange pursuant to the Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, 124 Stat. 119 (Affordable Care Act or ACA). Thus, the plaintiffs' insurance plan is subject to the Affordable Care Act, but it is *not* subject to ERISA.

B.     History of mental health parity laws

Historically, mental health treatment options were limited to "institutions and asylums," which were "rarely covered" by private health insurance because mental health treatment was "regarded as the province of the states." Suann Kessler, *Mental Health Parity: The Patient Protection and Affordable Care Act and the Parity Definition Implications*, 6 HASTINGS SCI. & TECH. L.J. 145, 148 (2014). However, the 20th century "deinstitutionalization" movement led to the release of many individuals from state-run institutions, and advances in treatment

*P.E.L., P.L. & J.L. v. Premera Blue Cross,* No. 101561-5

have led to a growing "[a]cceptance of psychiatry and psychology as legitimate branches of medicine." *Id.* at 148-49. Despite recent advances, discrimination against individuals with mental health conditions and substance use disorders continues, "including in social interactions, access to housing, access to health care, and employment." *Id.* at 150.

One area of persistent discrimination is "in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for [other] medical and surgical conditions."[2] *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016). Historically, insurers could impose "higher premiums, fewer services, and shorter coverage periods" for mental health and substance use disorder services or they could simply "choose not to offer mental health coverage." Kessler, *supra*, at 151. Parity laws seek to address such disparities by "requir[ing] that insurance coverage be at parity for mental health services, which means this coverage be delivered under the same terms and conditions as medical and surgical services." LAWS OF 2005, ch. 6, § 1.

---

[2] Insurers may distinguish between mental health benefits and other medical benefits "consistent with generally recognized independent standards of current medical practice" and "in accordance with applicable Federal and State law." 45 C.F.R. § 146.136(a). State law and the plaintiffs' insurance plan distinguish mental health services from other medical services based on whether the underlying condition is "listed in the most current version of the diagnostic and statistical manual of mental disorders, published by the American psychiatric association." Former RCW 48.44.341(1) (2007); *see* CP at 143.

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The first federal parity legislation was the Mental Health Parity Act of 1996, Pub. L. No. 104-204, 100 Stat. 2874. Kessler, *supra*, at 153-54. The act restricted insurers' "ability to set unequal annual and lifetime aggregate spending limits," but insurers had the "option of completely dropping coverage of mental health services if they did not want to comply." *Id.* at 154. Moreover, it "contained a sunset provision which completely eliminated the parity requirements by 2006." *Id.* at 155.

Before the federal parity act expired, our legislature enacted Washington's first state-level parity statute, finding "that the costs of leaving mental disorders untreated or undertreated are significant," as are "the potential benefits of improved access to mental health services." LAWS OF 2005, ch. 6, § 1. The statute "require[s] health insurers to cover treatment for mental health disorders and to do so in parity with the medical and surgical services it covers." *O.S.T. v. Regence BlueShield*, 181 Wn.2d 691, 699, 335 P.3d 416 (2014). Specific provisions of our state parity statute are discussed in more detail as relevant to the analysis below.

The next major piece of federal legislation was the 2008 Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act, Pub. L. No. 110-343, 122 Stat. 3765 (MHPAEA). Kessler, *supra*, at 156. MHPAEA "both strengthened and broadened federal parity requirements enacted in 1996." GAO-20-150, *supra*, at 7. However, MHPAEA applied only to "group health plans

sponsored by large employers," such as ERISA plans. *Id.* Moreover, like the Mental Health Parity Act of 1996, MHPAEA did not actually "require insurers to cover mental health services." Kessler, *supra*, at 157.

Finally, the 2010 Affordable Care Act "introduc[ed] sweeping changes to the health care structure." *Id.* at 158. Among other reforms, the Affordable Care Act "extended MHPAEA parity requirements to individual insurance plans and some small group health plans." GAO-20-150, *supra*, at 8; *see* 42 U.S.C. §§ 300gg-26, 18031(j). In addition, the Affordable Care Act requires coverage for "ten essential health benefits categories," one of which is "[m]ental health and substance use disorder services, including behavioral health treatment." GAO-20-150, *supra*, at 8; 42 U.S.C. § 18022(b)(1)(E).

Thus, the Affordable Care Act requires most[3] insurance plans to cover mental health and substance use disorder services and to do so on an equal basis as compared to other medical and surgical services. Specific federal parity provisions are discussed in more detail as relevant to the analysis below.

---

[3] The Affordable Care Act does "not extend to all insurance policies," and it "exempts grandfathered" plans "from covering the essential benefits package, including mental health services." Kessler*, supra*, at 160-61. The plaintiffs' plan is "Non-Grandfathered." CP at 1946.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

A.      P.E.L.'s enrollment in Evoke

At all relevant times, P.E.L. was a minor and a beneficiary of her parents' health insurance plan.  In February 2016, P.E.L. "was hospitalized for depression and suicidality."  CP at 400.  Following her release from the hospital, P.E.L. started outpatient therapy, but her parents soon determined that "more intensive interventions" were needed.  *Id.*  To find an appropriate program, P.E.L.'s parents hired an "Independent Educational and Therapeutic Consultant," who recommended the Evoke program.  *Id.* at 1673.

P.E.L. was admitted to Evoke on April 27, 2016 and discharged on June 28, 2016.  At all relevant times, Evoke was a licensed "Outdoor Youth Program" in Bend, Oregon.  *Id.* at 1690.  Pursuant to Oregon law, outdoor youth programs "provide[ ], in an outdoor living setting, services to children who have behavioral problems, mental health problems or problems with abuse of alcohol or drugs."  Former OR. REV. STAT. § 418.205(2)(a)(A)(v), (5)(a) (2016).

There is no information in the record from P.E.L. about her experience at Evoke.  Information provided by P.E.L.'s parents and Evoke staff indicates that P.E.L. engaged in daily group activities and learned wilderness skills, such as "hiking, fire building, and shelter making."  CP at 1813.  P.E.L. also "took part in

*P.E.L., P.L. & J.L. v. Premera Blue Cross,* No. 101561-5

the therapeutic milieu,"[4] participated in "group therapy twice weekly," and received "weekly individual psychotherapy and family intervention" with a licensed counselor. *Id.* at 1836.

P.E.L.'s discharge summary states that she "displayed significant progress in her ability to self-regulate mood and behavior," as well as "significant improvement in her ability to cope with the challenges of living in the wilderness." *Id.* at 1837. Nevertheless, the Evoke counselor was "extremely concerned regarding her risk for relapsing" and recommended placement in "a residential or therapeutic boarding school." *Id.* at 1838.

Following her discharge from Evoke, P.E.L. was placed in a series of other programs. While P.E.L. was in her final placement, a family member became seriously ill, and she went home to see them. At that time, P.E.L. and her parents decided that she would come home to stay, and P.E.L. withdrew from her placement "[p]remature[ly], but with program approval." *Id.* at 2666. She subsequently graduated from high school and enrolled in college.

---

[4] In this context, the "milieu" appears to refer to the outdoor/wilderness setting of the program, as contrasted with "the treatment milieu offered by a brick-and-mortar residential mental health facility." CP at 998.

9

*P.E.L., P.L. & J.L. v. Premera Blue Cross,* No. 101561-5

B.      Premera's denial of coverage for Evoke

Evoke charges an initial enrollment fee, plus a flat rate of $525 per day; therapy sessions are not billed separately from other program costs.[5]  The minimum stay is six weeks, which can be extended in one-week increments.  When a child enrolls at Evoke, their family must make "a minimum initial payment of $25,000.00 which covers the first 42 days of the program and includes the enrollment fee."  *Id.* at 1703 (emphasis omitted).  P.E.L.'s parents paid Evoke's fees and submitted claims to Premera for reimbursement.

The plaintiffs' health insurance plan covers "residential treatment . . . to manage or reduce the effects of [a] mental condition."  *Id.* at 110.  However, the plan contains a wilderness exclusion, which provides that "[t]he Mental Health, Behavioral Health and Substance Abuse benefit does not cover . . . [o]utward bound, wilderness, camping or tall ship programs or activities."  *Id.* at 111-12 (boldface omitted).

When the plaintiffs submitted a claim for P.E.L.'s first month at Evoke, Premera paid it in part.  However, when the plaintiffs submitted a claim for the rest of P.E.L.'s time at Evoke, Premera denied it in full and "voided" its earlier payment, stating in internal documentation that "[t]his was for a wilderness

---

[5] Premera asserts that it would evaluate coverage for P.E.L.'s therapy sessions at Evoke "if Plaintiffs or Evoke submitted separate claims for those sessions."  CP at 573.

10

program. This is not covered and [is] a clear contract exclusion." *Id.* at 1905. The

denial of coverage was affirmed on internal and external review in accordance with

contractual and administrative review procedures.[6] The plaintiffs subsequently

filed suit against Premera in King County Superior Court.

C.      The lawsuit is dismissed but partially reinstated on appeal

The plaintiffs sued for (1) breach of contract based on "the literal terms of

the plan, as modified by" state and federal parity laws, (2) insurance bad faith,

(3) violation of the CPA, and (4) "negligent claims management." *Id.* at 1532-34

(capitalization and boldface omitted). The negligent claims management action is

no longer at issue.

Premera moved for dismissal of the plaintiffs' claims on summary judgment.

The plaintiffs filed a cross motion for partial summary judgment to determine

whether Premera violated state parity laws and "breached its insurance contract

when it denied coverage for P.E.L.'s treatment at Evoke without any consideration

of medical necessity." *Id.* at 377. The trial court denied the plaintiffs' motion and

---

[6] Health insurance plans must contain "fully operational, comprehensive, and effective" review processes with "the opportunity for both internal review and external review." RCW 48.43.530(1); WAC 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(1); *cf.* 42 U.S.C. § 300gg-19. Internal reviews are mandatory and conducted by the insurer. WAC 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, -3110. External reviews are optional and conducted by independent review organizations certified by the Office of the Insurance Commissioner. RCW 48.43.535; WAC 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. If external review is taken, the insurer "must timely implement the certified independent review organization's determination, and must pay the certified independent review organization's charges." RCW 48.43.535(8).

granted Premera's motion in part, dismissing the plaintiffs' *state* parity claims but declining to dismiss their *federal* parity claims.

Premera subsequently moved for summary judgment on the plaintiffs' remaining claims. The plaintiffs filed a cross motion for partial summary judgment to determine "[w]hether Premera's blanket exclusion of coverage for wilderness treatment programs violates the Affordable Care Act's mental health parity requirements." *Id.* at 2404. The trial court granted Premera's motion and dismissed the plaintiffs' lawsuit, ruling in relevant part that (1) federal parity violations do not give rise to a viable common law breach of contract claim and (2) the plaintiffs failed to support their insurance bad faith claim for emotional distress damages with evidence of objective symptomatology.[7]

In a published opinion, the Court of Appeals affirmed dismissal of the breach of contract action based on Premera's alleged violation of *state* parity laws. However, the Court of Appeals partially reinstated the breach of contract action based on Premera's alleged violation of *federal* parity laws. The Court of Appeals also reversed and remanded the insurance bad faith action, holding that the objective symptomatology requirement does not apply.

---

[7] The trial court may also have dismissed the insurance bad faith claim on the merits. 2 Oral Args. (June 11, 2021) at 132-33. However, the Court of Appeals reversed based solely on the objective symptomatology requirement. *P.E.L.*, 24 Wn. App. 2d at 510-12. There was no motion for clarification or reconsideration at the Court of Appeals, and the parties do not address the merits of the insurance bad faith claim in their briefing to this court. We therefore consider only the objective symptomatology issue.

12

*P.E.L., P.L. & J.L. v. Premera Blue Cross,* No. 101561-5

Premera sought review of two issues: (1) whether an alleged violation of federal parity laws gives rise to a viable breach of contract action and (2) whether the objective symptomatology requirement for emotional distress damages applies in the insurance bad faith context. The plaintiffs contingently sought review on the merits of their state and federal parity claims. We granted review without limitation.[8] The issues in this case are questions of law that were decided on summary judgment, so our review is de novo. *O.S.T.*, 181 Wn.2d at 696.

### ISSUES

A.    Is either party entitled to summary judgment on the plaintiffs' breach of contract action based on Premera's alleged violation of *federal* parity laws?

B.    Is either party entitled to summary judgment on the plaintiffs' breach of contract action based on Premera's alleged violation of *state* parity laws?

C.    Must the plaintiffs produce evidence of objective symptomatology to support their insurance bad faith claim for emotional distress damages?

---

[8] Breaking Code Silence filed an amicus memorandum supporting review. After granting review, we accepted amici briefs from (1) Northwest Health Law Advocates, the National Health Law Program, the Center for Health Law and Policy Innovation of Harvard Law School, the Kennedy Forum, the Autism Legal Resource Center, and the National Autism Law Center, (2) the Washington State Insurance Commissioner, and (3) the Washington State Association for Justice Foundation.

13

*P.E.L., P.L. & J.L. v. Premera Blue Cross,* No. 101561-5

ANALYSIS

A.     The plaintiffs do not state a viable breach of contract action based on Premera's alleged federal parity violations

First, we consider the plaintiffs' breach of contract action based on Premera's alleged violation of federal parity laws.  Before reaching the merits, we must determine whether the plaintiffs state a viable cause of action.

Federal parity laws are subject to different enforcement mechanisms, depending on the underlying insurance plan.  For insureds with ERISA plans, Congress has expressly created private rights of action that an insured may bring to enforce federal parity laws.  *See* 29 U.S.C. § 1132(a).  However, for those with non-ERISA plans, the Affordable Care Act "provides no private right of action" to enforce its parity provisions.  *York v. Wellmark, Inc.*, 965 F.3d 633, 638 (8th Cir. 2020) (*York* II).  Lacking a federal right of action, the plaintiffs seek to challenge Premera's alleged violation of federal parity laws in a common law breach of contract claim.

The plaintiffs emphasize, correctly, that the Affordable Care Act "'does not preempt consumers' traditional ability to vindicate their rights under the insurance laws of their state.'"  Resp'ts' Answer to Premera Blue Cross's Pet. for Rev. at 19 (quoting *Briscoe v. Health Care Serv. Corp.*, 281 F. Supp. 3d 725, 739 (N.D. Ill. 2017)).  The Affordable Care Act's preemption provision is narrow, applying only

14

*P.E.L., P.L. & J.L. v. Premera Blue Cross,* No. 101561-5

where state law "prevents the application" of federal law. 42 U.S.C. § 300gg-23(a)(1); *cf.* 15 U.S.C. §§ 1011-1012.

However, the question of federal preemption does not arise unless there is something to preempt. Premera does not merely argue that the plaintiffs' breach of contract action is preempted by the Affordable Care Act. Premera also argues that a federal parity violation does not give rise to a viable breach of contract action in the first place. The latter argument is a threshold question of state law, which we must resolve before reaching federal preemption.

The plaintiffs advance two theories supporting the viability of their federal parity claims: implicit incorporation and express incorporation. Pursuant to both theories, the plaintiffs argue that Premera's compliance with the Affordable Care Act is an actionable duty of their health insurance contract. However, adopting the plaintiffs' view would require an extension of our precedent, with potentially serious consequences for the interpretation and enforcement of federal law. The plaintiffs do not adequately address these concerns in their briefing.

Thus, although we do not rule out the possibility of incorporating federal law as an actionable duty in an insurance contract, we decline at this time to hold that compliance with the Affordable Care Act is an actionable duty imposed by the plaintiffs' insurance contract with Premera. Therefore, we hold that Premera's

15

alleged violation of federal parity law does not give rise to a viable breach of contract action. We need not reach the issue of federal preemption.

      1.     The plaintiffs' implicit incorporation argument seeks to extend our precedent

The plaintiffs' first theory supporting their federal parity claim is implicit incorporation. They argue that "state statute" and "longstanding caselaw holds that governing insurance law is incorporated into an insurance contract, excising conflicting terms." Suppl. Br. of Pls./Resp'ts at 9-10. However, the plaintiffs do not cite authority directly supporting this argument.

The plaintiffs cite numerous authorities recognizing that insurance contracts implicitly incorporate applicable *state* law and that a violation of applicable *state* law gives rise to a breach of contract action. *See id.* (citing *Durant v. State Farm Mut. Auto. Ins. Co.*, 191 Wn.2d 1, 11, 419 P.3d 400 (2018) (Washington regulation implementing Washington statutes); *UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358, 376-77, 119 S. Ct. 1380, 143 L. Ed. 2d 462 (1999) (California common law); RCW 48.18.510 ("this code")). However, the plaintiffs' briefing to this court cites no case recognizing a breach of contract action based on the implicit incorporation of *federal* law.

Likewise, most of the authorities the plaintiffs cited to the Court of Appeals and the trial court discuss only the implicit incorporation of *state* law. *See*

16

*P.E.L., P.L. & J.L. v. Premera Blue Cross,* No. 101561-5

Opening Br. of Appellants at 54 (Wash. Ct. App. No. 82800-2-I (2021));[9] Reply

Br. of Appellants at 21-22 (Wash. Ct. App. No. 82800-2-I (2022));[10] CP at 2415-

16, 2578, 2786.[11]  The plaintiffs did cite some federal district court opinions

indicating that insurance contracts may implicitly incorporate federal law, but

those opinions do not actually decide the issue on the merits, and none of them

were issued by Washington courts.  *See* Opening Br. of Appellants at 57, 59

(Wash. Ct. App. No. 82800-2-I (2021));[12] Reply Br. of Appellants at 30 (Wash. Ct.

App. No. 82800-2-I (2022));[13] CP at 2416, 2577, 2785.[14]

Thus, the plaintiffs cite no authority holding that applicable federal laws are

implicitly incorporated as actionable duties in Washington insurance contracts.

This does not preclude us from extending our precedent to recognize the plaintiffs'

---

[9] Citing RCW 48.18.510; *Plumb v. Fluid Pump Serv., Inc.*, 124 F.3d 849, 861 (7th Cir. 1997) (Illinois law); *UNUM*, 526 U.S. at 376-77; *Brown v. Snohomish County Physicians Corp.*, 120 Wn.2d 747, 753, 845 P.2d 334 (1993) (Washington law); *O.S.T.*, 181 Wn.2d at 707 (Washington law).

[10] Citing *UNUM*, 526 U.S. at 376-77; *Durant*, 191 Wn.2d at 11; *Liberty Mut. Ins. Co. v. Tripp*, 144 Wn.2d 1, 12, 25 P.3d 997 (2001) (Washington law); *Kyrkos v. State Farm Mut. Auto. Ins. Co.*, 121 Wn.2d 669, 671, 852 P.2d 1078 (1993) (Washington law).

[11] Citing *Cornish Coll. of the Arts v. 1000 Va. Ltd. P'ship*, 158 Wn. App. 203, 223-24, 242 P.3d 1 (2010) (Washington law); *Z.D. v. Grp. Health Coop.*, 829 F. Supp. 2d 1009, 1013 (W.D. Wash. 2011) (Washington law); *Brown*, 120 Wn.2d at 753; *O.S.T.*, 181 Wn.2d at 707; *UNUM*, 526 U.S. at 376-77; *Plumb*, 124 F.3d at 861.

[12] Citing *Smith v. Golden Rule Ins. Co.*, 526 F. Supp. 3d 374 (S.D. Ind. 2021); *Mingus v. Blue Cross & Blue Shield of Kan., Inc.*, No. 2:17-CV-02362-JAR-KGS, 2017 WL 4882658 (D. Kan. 2017) (ct. ord.); *Reyes v. Blue Cross & Blue Shield of Fla., Inc.*, No. 4:21-cv-10030-JLK (S.D. Fla. 2021) (ct. ord.); *Mills v. Bluecross Blueshield of Tenn., Inc.*, No. 3:15-cv-552-PLR-HBG, 2017 WL 78488 (E.D. Tenn. 2017) (ct. ord.).

[13] Citing *Heston v. Int'l Med. Grp., Inc.*, 528 F. Supp. 3d 963, 976 (S.D. Ind. 2021).

[14] Citing *Golden Rule*, 526 F. Supp. 3d 374; *Mills*, 2017 WL 78488; *Mingus*, 2017 WL 4882658.

claim in this case, but we must be cautious. Unlike the implicit incorporation of state law, implicit incorporation of the Affordable Care Act may affect the interpretation and enforcement of federal law, as discussed further below.

> 2. The plaintiffs' express incorporation argument relies on broad language that does not impose independent contractual duties

In addition to implicit incorporation, the plaintiffs argue that the Affordable Care Act is expressly incorporated into their insurance plan by the following statement:

> This plan will comply with the federal health care reform law, called the Affordable Care Act (see Definitions), including any applicable requirements for distribution of any medical loss ratio rebates and actuarial value requirements. If Congress, federal or state regulators, or the courts make further changes or clarifications regarding the Affordable Care Act and its implementing regulations, including changes which become effective on the beginning of the calendar year, this plan will comply with them even if they are not stated in this booklet or if they conflict with statements made in this booklet.

CP at 85. The plan's mental health section also provides, "This plan will comply with federal mental health parity requirements." *Id.* at 110.

According to the plaintiffs, these statements impose an actionable duty on Premera to comply with the Affordable Care Act, including its parity provisions. Yet, Premera would have precisely the same duty, even without the contractual language. The question in this case is not *whether* Premera is required to comply with the Affordable Care Act—of course it is. The question is whether a private party may *enforce* the Affordable Care Act in a breach of contract action.

18

*P.E.L., P.L. & J.L. v. Premera Blue Cross,* No. 101561-5

Persuasive authority from the United States Supreme Court indicates that this question cannot be resolved by the broad language in the plaintiffs' insurance plan.

In *Astra USA, Inc. v. Santa Clara County*, the Supreme Court considered a federal program that "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities." 563 U.S. 110, 113, 131 S. Ct. 1342, 179 L. Ed. 2d 457 (2011) (citing 42 U.S.C. § 256b). The program "employs a form contract as an opt-in mechanism" for drug manufacturers. *Id.* at 115. However, "Congress authorized no private right of action" to challenge alleged violations of the statutory price ceiling. *Id.* at 113. Instead, enforcement authority was vested in administrative agencies. *Id.* at 116.

The Supreme Court unanimously rejected an attempt "to enforce ceiling-price contracts" through private litigation. *Id.* at 113. The Court explained that the program's opt-in form contracts "simply incorporate statutory obligations and record the manufacturers' agreement to abide by them." *Id.* at 118. Moreover, the plaintiff "based its suit on allegations that the manufacturers charged more than the [statutory] ceiling price, not that they violated any independent substantive obligation arising only from the [contracts]." *Id.* at 118-19 (citation omitted). *Astra* concluded that "[r]ecognizing the [plaintiff]'s right to proceed in court could spawn a multitude of dispersed and uncoordinated lawsuits" in which "the risk of

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

conflicting adjudications would be substantial." *Id.* at 120. Such a result would be "incompatible with the statutory regime." *Id.* at 113.

There are many similarities between this case and *Astra*. The plaintiffs seek to enforce a federal statute for which Congress authorized no private right of action and instead vested primary enforcement authority in state agencies. *See* 42 U.S.C. § 300gg-22(a)(1). The plaintiffs also rely on broad statements recognizing Premera's already-mandatory duty to comply with applicable federal law rather than the independent substantive obligations of their contract. Thus, although *Astra* is not directly controlling, it indicates that the broad language in the plaintiffs' insurance plan does not, in itself, create an actionable duty in contract.

The plaintiffs argue that *Astra* is not persuasive authority for two reasons. First, they assert that unlike the plaintiff in *Astra*, their breach of contract action does *not* actually seek to enforce the Affordable Care Act. Instead, according to the plaintiffs, "[r]esidential mental health coverage is the 'independent right' Plaintiffs seek to enforce." Resp'ts' Answer to Premera Blue Cross's Pet. for Rev. at 22. This argument is inconsistent with the plaintiffs' briefing.

"A breach of contract is actionable only if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant." *Nw. Indep. Forest Mfrs. v. Dep't of Lab. & Indus.*, 78 Wn. App. 707, 712, 899 P.2d 6 (1995). When moving for partial summary judgment, the plaintiffs focused on

duty and breach, arguing "that Premera breached its contract when it violated the ACA's parity requirements." CP at 2424. Likewise, the plaintiffs argued to the Court of Appeals that "[s]ince Premera breache[d] . . . the ACA's parity requirements when it applied the Wilderness Exclusion, it also breached its contract." Opening Br. of Appellants at 53-54 (Wash. Ct. App. No. 82800-2-I (2021)). Consistently, the plaintiffs argue to this court that "[c]ompliance with the ACA is part of the express bargain between Plaintiffs and Premera. When Premera ignored the parity requirements, it breached this contractual provision." Resp'ts' Answer to Premera Blue Cross's Pet. for Rev. at 16. Thus, the plaintiffs have repeatedly argued that a violation of the Affordable Care Act *is* an actionable breach of their insurance contract. We must conclude that their breach of contract action does, in fact, seek to enforce the Affordable Care Act.

Second, the plaintiffs argue that we should not rely on *Astra* because that case did not involve an insurance contract and "different rules apply to insurance." *Id.* at 19. Instead of *Astra*, the plaintiffs urge us to follow the approach of two federal district court decisions that *did* involve insurance contracts, *York v. Wellmark, Inc.*, No. 4:16-cv-00627-RGE-CFB, 2017 WL 11261026 (S.D. Iowa

*P.E.L., P.L. & J.L. v. Premera Blue Cross,* No. 101561-5

2017) (ct. ord.)[15] (*York* I), and *Briscoe*, 281 F. Supp. 3d 725.  The plaintiffs'

reliance on these cases is misplaced.

*York* I and *Briscoe* involved multiple plaintiffs, some with ERISA plans and

some with non-ERISA plans.  *York* I, 2017 WL 11261026, at *4; *Briscoe*, 281 F.

Supp. 3d at 731.  The plaintiffs with non-ERISA plans brought state-law breach of

contract actions.  *York* I, 2017 WL 11261026, at *4; *Briscoe*, 281 F. Supp. 3d at

729-30, 739.  The plaintiff in each case alleged that her insurance plan "guarantees

her comprehensive lactation benefits consistent with the ACA's preventive service

requirements."  *York* I, 2017 WL 11261026, at *19; *cf. Briscoe*, 281 F. Supp. 3d at

739.

The defendant insurers moved to dismiss the breach of contract actions,

arguing that "Plaintiffs cannot use state law to circumvent federal law that does not

provide a private right of action."  *York* I, 2017 WL 11261026, at *19; *cf. Briscoe*,

281 F. Supp. 3d at 739.  The motions were denied because the Affordable Care Act

does not "preempt or restrict consumers' traditional ability to vindicate their rights

under the insurance laws of their state."  *York* I, 2017 WL 11261026, at *20; *cf.*

*Briscoe*, 281 F. Supp. 3d at 739.  The plaintiffs urge us to apply the same analysis

here.  We decline to do so.

---

[15] Unpublished court orders and opinions are cited as "necessary for a reasoned decision."
GR 14.1(c).

*P.E.L., P.L. & J.L. v. Premera Blue Cross,* No. 101561-5

*York* I and *Briscoe* explicitly rely on a federal preemption analysis. As discussed above, this analysis assumes that the plaintiff has stated a viable state law action and then considers whether the action is preempted by federal law. Before reaching federal preemption, we must first determine whether the plaintiffs have stated a viable breach of contract action in accordance with Washington law. *York* I and *Briscoe* provide no guidance on that question.

Moreover, *York* I and *Briscoe* address specific contractual provisions guaranteeing coverage of a particular service (lactation benefits), which is also guaranteed by the Affordable Care Act. Neither case considered whether a broad statement that an insurance plan will comply with the entire Affordable Care Act imposes a duty that is actionable in contract. Therefore, *York* I and *Briscoe* do not aid our interpretation of the plaintiffs' insurance contract with Premera.

Finally, the district court's decision in *York* I was not the final decision in that case. It appears the parties in *Briscoe* ultimately settled. However, the insurer in *York* I prevailed on summary judgment, and the plaintiffs appealed. Although the issue was not raised on appeal, the Eighth Circuit Court of Appeals expressed concern about the breach of contract action: "Plaintiffs simply present York's claims as if they were based on a federal private right of action the ACA does not provide. This alone is reason to affirm the district court's dismissal." *York* II, 965

F.3d at 639 n.3. This statement was dicta, but it cautions against relying on *York* I, as the plaintiffs urge us to do.

For these reasons, we decline to adopt the analysis from *York* I and *Briscoe*. Although we recognize that *Astra* is not controlling, it provides persuasive authority supporting Premera. Accordingly, we approach the plaintiffs' express incorporation argument with the same degree of caution as their implicit incorporation argument.

> 3. We decline to recognize the plaintiffs' breach of contract action based on Premera's alleged violation of federal parity laws

Because existing law does not provide a definitive answer, we must carefully consider the consequences of extending our precedent to allow private enforcement of the Affordable Care Act through common law breach of contract actions. Doing so could significantly interfere with the interpretation and enforcement of federal law, but the plaintiffs' briefing does not adequately address these concerns. Therefore, at this time, we decline to recognize their breach of contract action based on Premera's alleged violation of federal parity laws.

Although this specific issue is a matter of first impression in our court, existing parity enforcement mechanisms provide important context for our decision. For purposes of this case, the Washington Office of the Insurance

*P.E.L., P.L. & J.L. v. Premera Blue Cross,* No. 101561-5

Commissioner (OIC) is the primary enforcement authority designated by statute.[16]
*See* RCW 48.02.060(1)-(2); 42 U.S.C. § 300gg-22(a)(1); Amicus Br. by OIC at 2-3, 6.  OIC's enforcement activities include adopting regulations to implement state and federal parity laws, reviewing health insurance contracts for unreasonable or unlawful terms before they are offered to consumers, certifying independent review organizations to hear appeals of adverse decisions in individual cases, and investigating consumer complaints.  *See* WAC 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; RCW 48.44.020(2); RCW 48.43.535-.537; CP at 1940.

Our precedent also recognizes private causes of action, including breach of contract actions, to enforce our *state* parity statute.  *See O.S.T.*, 181 Wn.2d at 695, 707.  By contrast, the enforcement of *federal* parity laws through private litigation depends, in the first instance, on which body of federal law applies.

If an insurance plan is subject to ERISA, federal law expressly creates private rights of action that an insured may bring "to recover benefits due" or "to enjoin any act or practice" that violates applicable law.  29 U.S.C. § 1132(a)(1)(B), (a)(3)(A).  Through these actions, an insured may directly challenge alleged parity violations.  *See, e.g., A.Z. v. Regence Blueshield*, 333 F. Supp. 3d 1069, 1072-73

---

[16] OIC does not have authority over all health insurance plans in Washington.  It has authority over the plan in this case because Premera is a "'[h]ealth carrier'" and a "'health insurance issuer.'"  RCW 48.43.005(30); 42 U.S.C. § 300gg-91(b)(2); *see* Amicus Br. by OIC at 2-3 & n.2.

25

(W.D. Wash. 2018). Indeed, the insured may be required to bring a federal action because many (but not all) state-law actions are "pre-empted" by ERISA. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004); *see also Hansen v. Grp. Health Coop.*, 902 F.3d 1051, 1058-59 (9th Cir. 2018); *W.G. Clark Constr. Co. v. Pac. Nw. Reg'l Council of Carpenters*, 180 Wn.2d 54, 61-65, 322 P.3d 1207 (2014).

However, because the plaintiffs have a non-ERISA plan, their federal parity claim is subject to the Affordable Care Act's enforcement mechanisms rather than ERISA's. As noted above, the Affordable Care Act does not create a private right of action to enforce its parity provisions. Instead, "[s]tates are generally responsible for enforcing [mental health] parity requirements through their oversight of health insurance companies." GAO-20-150, *supra*, at 2; *see* 42 U.S.C. § 300gg-22(a)(1). OIC provides such oversight in Washington.

Nevertheless, the plaintiffs argue that "[n]o evidence suggests that Congress intended to leave consumers who purchased their health coverage on state exchanges with fewer rights than those with employer-based coverage." Resp'ts' Answer to Premera Blue Cross's Pet. for Rev. at 20. Congress clearly intended to provide the same *substantive* parity protections in both contexts. 42 U.S.C. § 18031(j) (parity provisions apply "in the same manner and to the same extent"); 45 C.F.R. § 147.160(a) (same). However, it is equally clear that Congress intended

different *enforcement mechanisms*, as evidenced by the plain statutory language. *Compare* 29 U.S.C. § 1132(a) (ERISA), *with* 42 U.S.C. § 300gg-22(a)(1) (ACA). Congressional intent does not control our decision to recognize a common law breach of contract action as a matter of Washington law. Nevertheless, Congress's decision is relevant to our decision.

Federal courts are "especially 'reluctant to tamper with [ERISA's] enforcement scheme'" because the "'carefully crafted and detailed enforcement scheme provides strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly.'" *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209, 122 S. Ct. 708, 151 L. Ed. 2d 635 (2002) (internal quotation marks omitted) (quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147, 105 S. Ct. 3085, 87 L. Ed. 2d 96 (1985); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 254, 113 S. Ct. 2063, 124 L. Ed. 2d 161 (1993)). However, ERISA's enforcement scheme would not apply to a common law breach of contract action adjudicated in state court. As a result, the plaintiffs' position may give insureds with non-ERISA plans *broader* private enforcement rights over federal parity laws than those with ERISA plans. This appears to undermine congressional intent for the enforcement of federal parity laws.

Moreover, the practical concerns raised in *Astra*, discussed above, are highly relevant here. Recognizing common law breach of contract actions based on

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

alleged federal parity violations "could spawn a multitude of dispersed and uncoordinated lawsuits," risking "conflicting adjudications." *Astra*, 563 U.S. at 120. The risk of conflicting adjudications is particularly high in this context because the correct interpretation of federal parity laws remains unsettled, even among federal courts with substantial experience adjudicating federal parity claims in ERISA actions.

Indeed, there is still "'no clear law on what is required to state a claim for a [federal] Parity Act violation,'" and different federal courts "'have continued to apply their own pleading standards.'" *Jonathan Z. v. Oxford Health Plans*, No. 2:18-cv-00383-JNP-JCB, 2022 WL 2528362, at *17 (D. Utah 2022) (ct. ord.) (quoting *Michael D. v. Anthem Health Plans of Ky., Inc.*, 369 F. Supp. 3d 1159, 1174 (D. Utah 2019)); *Smith v. Golden Rule*, 526 F. Supp. 3d 374, 386 (S.D. Ind. 2021) (quoting *Michael W. v. United Behavioral Health*, 420 F. Supp. 3d 1207, 1234 (D. Utah 2019)). Some courts have ruled that "[t]o properly plead a Parity Act violation," the plaintiff must "correctly identify the relevant limitation" and "then allege a flaw in this limitation based on a comparison to a relevant analogue." *Welp v. Cigna Health & Life Ins. Co.*, No. 17-80237-CIV-MIDDLEBROOKS, 2017 WL 3263138, at *5 (S.D. Fla. 2017) (ord.). Others disagree, reasoning that "[p]lans should not be able to exclude mental health

*P.E.L., P.L. & J.L. v. Premera Blue Cross,* No. 101561-5

treatments only because a clear analog does not exist." *Michael D.*, 369 F. Supp. 3d at 1175.

Recognizing state-law breach of contract actions based on federal parity violations would more likely increase this confusion than help to resolve it. For example, as OIC explains, the Court of Appeals' federal parity analysis in this case appears to compare *inpatient* mental health benefits with *outpatient* benefits for other medical conditions. *See* Amicus Br. by OIC at 17; *P.E.L.*, 24 Wn. App. 2d at 507 (comparing wilderness programs to exercise classes). This comparison is contrary to federal parity law, which requires that benefits be compared within the "same classification." 45 C.F.R. § 146.136(c)(2)(i).

Nevertheless, the Court of Appeals' reasoning was understandable; the complexity of federal parity law makes it likely that *any* court could make a good faith error of interpretation. Moreover, because the interpretation of federal parity laws remains unsettled, state courts could easily interpret federal parity laws in a way that is reasonable but subsequently rejected by federal authorities. We are reluctant to add to this complexity and uncertainty.

The likelihood of inadvertently departing from federal authorities in the interpretation of federal parity laws raises the additional risk of "'interfer[ing] with the implementation'" of the Affordable Care Act in Washington. *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003) (quoting *Davis v. United Air*

*Lines, Inc.*, 575 F. Supp. 677, 680 (E.D.N.Y. 1983)), *cited with approval in Astra*, 563 U.S. at 118. As noted, the Affordable Care Act vests primary enforcement authority in state agencies, like OIC. However, the act authorizes federal authorities to take over enforcement duties if "a State has failed to substantially enforce" any of its provisions. 42 U.S.C. § 300gg-22(a)(2). OIC expresses concern that such a takeover could occur here "[i]f the erroneous Court of Appeals parity analysis . . . is allowed to stand," which "could create a more complex and expensive regulatory environment for carriers and consumers" and "would also be an erosion of the State's autonomy over the regulation of insurance." Amicus Br. by OIC at 18-19.

The likelihood of federal authorities taking over enforcement of federal parity laws in Washington is unclear. Nevertheless, we take seriously OIC's concerns. If Washington appellate courts inadvertently depart from the prevailing federal interpretation of federal parity laws, OIC may be *unable* to fully enforce federal parity laws until contrary Washington precedent is disavowed. This would do a great disservice to Washington insureds, regardless of whether a federal takeover actually occurs.

Ultimately, the plaintiffs do not adequately address the consequences of extending our precedent to recognize their breach of contract action based on Premera's alleged violation of federal parity laws. Therefore, although we do not

rule out the possibility of recognizing common law breach of contract actions based on federal statutory violations, we decline at this time to recognize the plaintiffs' breach of contract action based on Premera's alleged violation of federal parity laws.

We emphasize that our holding on this issue does *not* prevent those with non-ERISA insurance plans from "challeng[ing] mental health parity violations in court when they find them." *Contra* Br. of Amici Curiae Nw. Health L. Advocs. et al. at 19. To the contrary, it is well established that a violation of *state* parity laws gives rise to a breach of contract action. *See O.S.T.*, 181 Wn.2d at 695. We take this opportunity to explicitly reaffirm that Washington insureds with non-ERISA health plans have the right to bring common law breach of contract actions to challenge alleged violations of our state parity statute.

Moreover, breach of contract is not the only state-law action that might be available. For example, the plaintiffs' insurance bad faith action depends on whether Premera's conduct "was 'unreasonable, frivolous, or unfounded,'" which necessarily requires some consideration of federal parity laws. *Smith v. Safeco Ins. Co.*, 150 Wn.2d 478, 484, 78 P.3d 1274 (2003) (quoting *Overton v. Consol. Ins. Co.*, 145 Wn.2d 417, 433, 38 P.3d 322 (2002)). In addition, the attorneys general of other states have obtained parity settlements against health insurers "using both federal and state law," including state consumer protection laws. Caroline V.

Lawrence & Blake N. Shultz, Note, *Divide and Conquer? Lessons on Cooperative Federalism from a Decade of Mental-Health Parity Enforcement*, 130 YALE L.J. 2216, 2249, 2252 (2021). Our opinion today does not foreclose similar actions in Washington.

In sum, we decline at this time to recognize the plaintiffs' breach of contract action based on Premera's alleged violation of federal parity laws. We reverse the Court of Appeals in part and reinstate the trial court's order granting summary judgment to Premera on the plaintiffs' federal parity claim.

B.      Premera is entitled to summary judgment on the plaintiffs' breach of contract action based on the alleged violation of state parity laws

Next, we consider the plaintiffs' breach of contract action based on Premera's alleged violation of state parity laws. It is undisputed that this is a viable cause of action, but the trial court granted summary judgment to Premera on the merits, and the Court of Appeals affirmed. We affirm the Court of Appeals.

The plaintiffs' state parity claim relies solely on heightened protections provided by our state parity statute, which exceed the minimum requirements of federal law. However, at all times relevant to this case, our state's heightened parity protections expressly excluded residential treatment, such as Evoke. Thus, the specific state parity claim in this case cannot succeed as a matter of law.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

1.      Overview of substantive parity protections

To understand the plaintiffs' state parity claim, it is first necessary to provide a general overview of the substantive protections provided by federal and state parity laws. Although there are many parallels between federal and state law, there are differences that affect our resolution of the issues presented.

a.      Federal parity laws primarily focus on equal coverage requirements

For purposes of this case, it is particularly important to distinguish between *equal* coverage requirements and *minimum* coverage requirements. As discussed in the historical overview above, federal parity laws were originally enacted to require *equal* coverage for mental health services as compared to other medical services. However, for many years, there were no federal *minimum* coverage requirements for mental health services. *See* Kessler, *supra*, at 154, 157. Indeed, prior to the Affordable Care Act, federal law "did not require insurers to cover mental health services at all." *Id.* at 157.

The Affordable Care Act introduced significant changes, including the first federal *minimum* coverage requirements. Insurers must now cover "essential health benefits" in the "general categor[y]" of "[m]ental health and substance use disorder services, including behavioral health treatment." 42 U.S.C. § 18022(b)(1)(E). To implement this requirement, federal regulations use "benchmark plan[s]" to determine "'the standardized set of essential health

benefits that must be met' by an insurer." *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 956 (9th Cir. 2020) (quoting 45 C.F.R. § 156.20).

Nevertheless, federal parity laws overall continue to focus primarily on *equal* coverage requirements. Like the earlier MHPAEA, the Affordable Care Act requires that "financial requirements" and "treatment limitations" must be "no more restrictive" for mental health and substance use disorder benefits than for "substantially all" other medical and surgical benefits. 42 U.S.C. § 300gg-26(a)(3)(A) (ACA); *cf.* 29 U.S.C. § 1185a(a)(3)(A) (MHPAEA). Federal equal coverage requirements also prohibit "separate cost sharing requirements" and "separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits." 42 U.S.C. § 300gg-26(a)(3)(A) (ACA); *cf.* 29 U.S.C. § 1185a(a)(3)(A) (MHPAEA).

Detailed federal regulations implement these equal coverage requirements, 45 C.F.R. § 146.136, which apply "in the same manner and to the same extent" in both the individual and large group markets. 45 C.F.R. § 147.160(a). Federal regulations divide health benefits into "six broad classifications"[17] and provide that "mental health or substance use disorder benefits must be provided in every

---

[17] The "only classifications" that may be used are: "(1) Inpatient, in-network," "(2) Inpatient, out-of-network," "(3) Outpatient, in-network," "(4) Outpatient, out-of-network," "(5) Emergency care," and "(6) Prescription drugs." 45 C.F.R. § 146.136(c)(2)(ii)(A) (italics omitted).

classification in which medical/surgical benefits are provided." Final Rules under MHPAEA, 78 Fed. Reg. 68,240-01, 68,246 (Nov. 13, 2013) (codified at 26 C.F.R. pt. 54; 29 C.F.R. pt. 2590; 45 C.F.R. pts. 146, 147). However, they "did not define the *scope* of the six classifications of benefits." *Id.* (emphasis added). Moreover, federal regulators "did not intend to impose a benefit mandate through the parity requirement," and their approach generally "defers to States to define the package of insurance benefits that must be provided in a State through [the essential health benefits]." *Id.*

Thus, although the Affordable Care Act imposes certain federal *minimum* coverage requirements for essential health benefits, federal parity laws overall continue to focus primarily on *equal* coverage requirements.

> b. State parity laws impose comprehensive minimum *and* equal coverage requirements

In contrast to federal parity laws, Washington's parity statute has long imposed comprehensive *minimum* coverage requirements for mental health services, in addition to *equal* coverage requirements.

Our state's *minimum* coverage requirements provide that every insurance plan covering "medical and surgical services" must provide coverage for "[m]ental health services" and "[p]rescription drugs." Former RCW 48.44.341(2)(c) (2007). "Mental health services" are broadly defined as "medically necessary outpatient and inpatient services provided to treat mental disorders covered by the diagnostic

categories listed in the most current version of the diagnostic and statistical manual of mental disorders, published by the American psychiatric association." *Id.* at (1). The former definition applicable to this case expressly excluded certain diagnoses and treatments, including "skilled nursing facility services, home health care, residential treatment, and custodial care." *Id.* at (1)(c). These exclusions have been removed, but only as applied to health insurance plans "issued or renewed on or after January 1, 2021." RCW 48.44.341(1)(b).

This court interpreted our state's minimum coverage requirements in *O.S.T.*, which held that "blanket exclusions of neurodevelopmental therapies in the plaintiffs' health contracts [were] void and unenforceable." 181 Wn.2d at 694. To reach this holding, *O.S.T.* recognized that our state parity statute "broadly mandates coverage for all medically necessary treatment for mental [health conditions] . . . except as expressly excluded" by the statute. *Id.* at 699.

Thus, *O.S.T.* holds that if a service (1) can be medically necessary to treat a mental health condition in some cases and (2) is not expressly excluded by the statutory definition of "mental health services," then an insurer cannot deny coverage for that service based on a blanket contractual exclusion. Instead, the insurer must conduct an individualized medical necessity review before denying coverage in any particular case. In this way, Washington law "impose[s] an independent coverage requirement, mandating that health plans for medical and

36

surgical care cover mental health treatment as well." *Hansen*, 902 F.3d at 1060

(citing *O.S.T.*, 181 Wn.2d 691).

In addition to requiring *minimum* coverage, our state parity statute also

requires *equal* coverage for mental health services. Therefore, an insurance plan's

mental health coverage must be "in parity with the [other] medical and surgical

services it covers." *O.S.T.*, 181 Wn.2d at 699. Similar to the federal equal

coverage requirements discussed above, our state statute requires equality in

"copayment or coinsurance," "maximum out-of-pocket limit[s]," and

"deductible[s]," among other things. Former RCW 48.44.341(2)(c)(i). In addition,

"[t]reatment limitations or any other financial requirements on coverage for mental

health services are only allowed if the same limitations or requirements are

imposed on coverage for medical and surgical services." *Id.*

In sum, by imposing comprehensive requirements for both *minimum*

coverage and *equal* coverage of mental health services, our state parity statute

"evidences legislative intent to require health insurers to cover treatment for mental

health disorders *and* to do so in parity with the medical and surgical services it

covers." *O.S.T*, 181 Wn.2d at 699 (emphasis added). By contrast, federal law

imposes comprehensive *equal* coverage requirements but more limited *minimum*

coverage requirements for essential health benefits. As a result, the minimum

37

*P.E.L., P.L. & J.L. v. Premera Blue Cross,* No. 101561-5

coverage requirements of our state parity statute may, in some instances, provide

heightened protections as compared to the Affordable Care Act's parity provisions.

2.    The plaintiffs' state parity claim is based solely on our state's
      heightened minimum coverage requirements

To evaluate the plaintiffs' state parity claim, we must determine which state

parity protections the plaintiffs seek to enforce.  We conclude that the plaintiffs'

state parity claim is based solely on our state's heightened minimum coverage

requirements.

Throughout this litigation, the plaintiffs have relied solely on WAC 284-43-

7080(2) to support their state parity claim.[18]  This regulation provides, "If a service

is prescribed for a mental health condition and is medically necessary, it may not

be denied solely on the basis that it is part of a category of services or benefits that

is excluded by the terms of the contract."  WAC 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(2).  The plaintiffs

claim that Premera violated this rule "when it administered P.E.L.'s claims without

considering whether the treatment [at Evoke] could be medically necessary."

Suppl. Br. of Pls./Resp'ts at 24.

---

[18] *See* CP at 375, 377, 389-91; Opening Br. of Appellants at 30-31, 34-35 (Wash. Ct. App. No. 82800-2-I (2021)); Reply Br. of Appellants at 20-27 (Wash. Ct. App. No. 82800-2-I (2022)); Resp'ts' Answer to Premera Blue Cross's Pet. for Rev. at 26-28; Suppl. Br. of Pls./Resp'ts at 21-24.  The plaintiffs cite other regulations in conjunction with their *federal* parity arguments but, as discussed above, we decline to recognize their breach of contract action based on Premera's alleged federal parity violations.  *E.g.*, Opening Br. of Appellants at 3-4, 46-49, 53 (Wash. Ct. App. No. 82800-2-I (2021)) (citing WAC 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(1); 42 U.S.C. § 300gg-26(a)(3)(A)(ii); 45 C.F.R. § 146.136(c)(4)(i)); Reply Br. of Appellants at 18 (Wash. Ct. App. No. 82800-2-I (2022)) (same); Suppl. Br. of Pls./Resp'ts at 4 (same).

It is undisputed that Premera did not conduct an individualized medical necessity review before denying coverage for Evoke. Nevertheless, the trial court dismissed the plaintiffs' state parity claim and the Court of Appeals affirmed because the applicable former version of our state parity statute expressly excluded "residential treatment" from the definition of "mental health services." Former RCW 48.44.341(1).

The plaintiffs argue that despite the statutory exclusion, the word "services" in WAC 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(2) refers to *all* mental health services, citing the regulatory definition of "[m]ental health benefits." WAC 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 (no exclusion for residential treatment); Wash. St. Reg. 14-23-057 (same). Thus, the plaintiffs' state parity claim presents a question of regulatory interpretation. "This court interprets regulations under the rules of statutory construction . . . giving effect to all of the language used," including "the language of the underlying statute." *Durant*, 191 Wn.2d at 8, 13. Therefore, to interpret the word "services" in WAC 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(2), we cannot rely solely on a regulatory definition. We must also identify the underlying statutory authority.

The plaintiffs argue that WAC 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(2) "implements both the federal and state parity laws," including the Affordable Care Act's "prohibition of separate categorical exclusions applicable only to mental health." Suppl. Br. of Pls./Resp'ts at 21-22; Reply Br. of Appellants at 20 (Wash. Ct. App. No. 82800-2-I (2022)).

We disagree. Although state parity regulations generally implement and "consolidate" both federal and state parity statutes, WAC 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, the specific language of WAC 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(2) implements only the heightened minimum coverage requirements of our state parity statute.

Preliminarily, WAC 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(2) clearly implements a *minimum* coverage requirement, not an *equal* coverage requirement. The plain language draws no comparison between mental health services and other medical services. It does not reference "equal" coverage, the "same" treatment limitations, "separate" exclusions, or anything to that effect. To the contrary, WAC 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(2) requires an individualized medical necessity review for prescribed mental health services *regardless* of whether such a review would be required for other medical or surgical services. Thus, it is clear that WAC 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(2) implements a minimum coverage requirement.

It is also clear that the minimum coverage requirement implemented by WAC 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(2) is a heightened protection of independent state law. As discussed above, the Affordable Care Act imposes certain minimum coverage requirements for essential health benefits, including "[m]ental health and substance use disorder services." 42 U.S.C. § 18022(b)(1)(E). Yet, the plaintiffs do *not* argue that the Affordable Care Act's essential health benefits package requires an individualized medical necessity review for mental health services. Instead, they

40

rely on other state and federal authorities to argue that WAC 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(2) implements a requirement of federal law. The authorities the plaintiffs cite do not support their argument.

The plaintiffs quote our opinion in *O.S.T.* to argue that the Affordable Care Act "raised the 'floor,' requiring coverage of residential treatment." Suppl. Br. of Pls./Resp'ts at 22 (emphasis and boldface omitted) (citing *O.S.T.*, 181 Wn.2d at 702-03). However, *O.S.T.* involves the minimum "floor" of coverage required by our state parity statute. 181 Wn.2d at 702. *O.S.T.* does not cite any provision of federal law, and the opinion repeatedly emphasizes our state parity statute's former definition of "mental health services" with its express exclusions. *See id.* at 698-99 & n.7, 704. Thus, the requirement for an individual medical necessity review we recognized in *O.S.T.* is derived solely from our state parity statute's *minimum* coverage requirements.

The plaintiffs argue that the same requirement is imposed by federal law, but they rely entirely on federal *equal* coverage requirements. *See* 42 U.S.C. § 300gg-26(a)(3)(A)(ii); 29 U.S.C. § 1185a(a)(3)(A)(ii); 45 C.F.R. § 146.136(c)(4)(iii) exs. 6, 9-10; *Danny P. v. Catholic Health Initiatives*, 891 F.3d 1155, 1158 (9th Cir. 2018). As discussed above, the federal equal coverage statute prohibits "more restrictive" or "separate" treatment limitations for mental health and substance use disorder services *as compared to other medical and surgical services*. 42 U.S.C.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

§ 300gg-26(a)(3)(A)(ii). By contrast, the plain language of WAC 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(2) requires no comparison to other services; it simply requires individualized medical necessity reviews before coverage may be denied for prescribed mental health services.

On its face, the federal equal coverage statute does not require individualized medical necessity reviews before coverage may be denied for mental health services, and the plaintiffs cite no case or regulation interpreting it that way. To the contrary, as discussed above, federal regulators "*did not intend to impose a benefit mandate* through the parity requirement that could require greater benefits for mental health conditions and substance use disorders than for medical/surgical conditions." Final Rules under MHPAEA, 78 Fed. Reg. at 68,246 (emphasis added).

Thus, the plaintiffs cite no authority indicating that WAC 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(2) implements a requirement of federal law. Therefore, we conclude that their state parity claim is based solely on the heightened minimum coverage requirements of our state parity statute, as implemented by WAC 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(2).

3.     The plaintiffs' state parity claim cannot succeed as a matter of law

The plaintiffs' state parity claim argues that Premera violated WAC 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(2) by denying coverage for Evoke without making an individualized medical necessity determination. During the relevant time frame for this case, our state

42

parity statute expressly excluded "residential treatment" from the definition of "mental health services." Former RCW 48.44.341(1). It is undisputed that Evoke is "residential treatment" within the meaning of the statute. Nevertheless, the plaintiffs argue that the Affordable Care Act's broader definition of "mental health services" preempts the narrower state definition. As applied to WAC 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(2), we cannot agree.

The plaintiffs are certainly correct that residential treatment is not excluded from the Affordable Care Act's *equal* coverage requirements. To the contrary, it is well established as a matter of federal law that if an insurance plan "will provide room and board reimbursement at licensed skilled nursing facilities for medical and surgical patients," then it must also "provide room and board reimbursement at residential treatment facilities for mental health patients." *Danny P.*, 891 F.3d at 1158. Thus, as applied to *equal* coverage requirements, our former statutory definition of "mental health services" may indeed be preempted by more protective provisions of federal law.

However, that question is not before us because the plaintiffs' state parity claim is not based on equal coverage requirements. Instead, as explained above, the plaintiffs' state parity claim relies solely on our state's heightened *minimum* coverage requirements, as implemented by WAC 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(2). The plaintiffs cite no provision of federal law providing similar or greater protections than WAC

43

*P.E.L., P.L. & J.L. v. Premera Blue Cross,* No. 101561-5

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(2). As a result, there is simply no basis to find federal preemption in the context of WAC 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(2).

The plaintiffs argue that their reading of WAC 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(2) is necessary to "interpret[ ] both the state and federal parity laws *in pari materia*, providing full effect to both, without any alteration of state statute." Resp'ts' Answer to Premera Blue Cross's Pet. for Rev. at 27. In fact, the plaintiffs' interpretation would broaden the *minimum* coverage requirements of our state parity statute by reference to federal *equal* coverage requirements. Adopting such an interpretation would expand WAC 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(2) beyond anything contemplated by state *or* federal legislators, exceeding the regulation's underlying statutory authority. Therefore, we cannot adopt the plaintiffs' interpretation. We hold that the "services" contemplated by WAC 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(2) are "mental health services" as defined by our state parity statute.

We reiterate that our state parity statute cannot diminish the Affordable Care Act's protections, and state law is preempted to the extent that it purports to do so. 42 U.S.C. § 300gg-23(a)(1). For example, an insurer could not avoid the Affordable Care Act's minimum coverage requirements for essential health benefits based on our state parity statute's definition of "mental health services." However, the plaintiffs do not raise an argument based on federal minimum coverage requirements for essential health benefits. Instead, the plaintiffs' state

44

parity claim relies solely on the heightened minimum coverage requirements of our state parity statute. They cite no federal law prohibiting our legislature from limiting the scope of heightened state-law protections, and that is precisely what our legislature chose to do with the definition of "mental health services" in our former parity statute. Former RCW 48.44.341(1).

At all relevant times, our former state parity statute excluded "residential treatment" from the definition of "mental health services." *Id.* at (1)(c). The exclusion has since been removed, but it remains applicable to "plans issued or renewed before January 1, 2021," like the plaintiffs' plan in this case. RCW 48.44.341(1)(a). It is undisputed that Evoke provides residential treatment. Therefore, during the relevant time period for this case, the Evoke program was not a "service" for purposes of our state parity statute or WAC 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(2). As a result, Premera did not violate WAC 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(2) by failing to conduct an individualized medical necessity review before denying coverage for Evoke. We affirm that Premera is entitled to summary judgment on the plaintiffs' state parity claim.

C.      The plaintiffs are not required to show objective symptomatology to pursue emotional distress damages for insurance bad faith

The final issue concerns the plaintiffs' insurance bad faith action. The merits are not before us. The trial court dismissed this action on summary judgment because the plaintiffs did not support their claim for emotional distress

damages with evidence of objective symptomatology, but the Court of Appeals reversed, holding the plaintiffs were not required to show objective symptomatology. *P.E.L.*, 24 Wn. App. 2d at 510-12. We affirm the Court of Appeals on this issue and remand to the trial court for further proceedings.

In Washington, "an insurer has a duty of good faith to its policyholder and violation of that duty may give rise to a tort action for bad faith." *Smith*, 150 Wn.2d at 484. Although the duty to act in good faith is memorialized by RCW 48.01.030, insurance bad faith is a common law tort, not a statutory cause of action. *Keodalah v. Allstate Ins. Co.*, 194 Wn.2d 339, 346, 449 P.3d 1040 (2019). As a result, insurance bad faith claims "are analyzed applying the same principles as any other tort: duty, breach of that duty, and damages proximately caused by any breach of duty." *Smith*, 150 Wn.2d at 485. The issue before us relates solely to damages.

It is well settled that "[b]ecause actionable bad faith is a tort, a plaintiff should not be limited to the economic damages within the contemplation of the parties at the time the contract was made." *Coventry Assocs. v. Am. States Ins. Co.*, 136 Wn.2d 269, 284, 961 P.2d 933 (1998). Instead, the insurer may be held "liable for the consequential damages" of their bad faith, including "general tort damages." *Id.* at 284-85. The parties do not dispute that emotional distress

*P.E.L., P.L. & J.L. v. Premera Blue Cross,* No. 101561-5

damages are available in an insurance bad faith action. They dispute only the evidence required to support such damages.

Premera argues the plaintiffs must produce "evidence of objective symptomatology." Suppl. Br. of Premera Blue Cross at 19. "The term 'objective symptomatology' emerged as a requirement for proof of negligent infliction of emotional distress." *Kloepfel v. Bokor*, 149 Wn.2d 192, 196, 66 P.3d 630 (2003) (emphasis omitted). "[T]o satisfy the objective symptomatology requirement . . . a plaintiff's emotional distress must be susceptible to medical diagnosis and proved through medical evidence." *Hegel v. McMahon*, 136 Wn.2d 122, 135, 960 P.2d 424 (1998). It is undisputed that the plaintiffs have not produced evidence of objective symptomatology in this case.

Whether the objective symptomatology requirement applies to insurance bad faith is a matter of first impression in our court; it was raised in a previous case, but we did not reach the merits because the insurer "provided 'virtually no authority or support for [its] argument.'" *Woo v. Fireman's Fund Ins. Co.*, 161 Wn.2d 43, 70, 164 P.3d 454 (2007) (alteration in original) (quoting record).[19] Here, the question is squarely presented and fully briefed.

---

[19] Some federal opinions have held that "[i]n *Woo*, the State Supreme Court determined that a party can rely exclusively on [their] own testimony to establish emotional distress in a bad-faith insurance case." *Scanlon v. Life Ins. Co. of N. Am.*, 670 F. Supp. 2d 1181, 1196 (W.D. Wash. 2009); *see also Taladay v. Metro. Grp. Prop. & Cas. Ins. Co.*, No. C14-1290-JPD, 2016 WL 3681469, at *21 (W.D. Wash. 2016) (ct. ord.). This is a misinterpretation of *Woo*.

47

The objective symptomatology requirement was originally based on "the 'view that a negligent act should have some end to its legal consequences.'" *Kloepfel*, 149 Wn.2d at 199 (quoting *Hunsley v. Giard*, 87 Wn.2d 424, 435, 553 P.2d 1096 (1976)). However, "the courts' interest to limit liability for negligent acts does not apply to willful, i.e., intentional, acts." *Id.* The distinction between negligent and intentional conduct "is related to the difference in fault" and its effect on foreseeability. *Id.* at 200. Where a person has intentionally or recklessly caused harm, "it can be fairly presumed that severe emotional distress was suffered," whereas ordinary negligence may not have a significant emotional impact. *Id.* at 202.

Based on this precedent, Premera contends that the relevant inquiry is whether insurance bad faith is a negligent or intentional tort. Premera correctly notes that insurance bad faith is a "tort sounding in negligence" because liability in an insurance bad faith action turns on the insurer's "reasonableness." Premera Blue Cross's Pet. for Rev. at 26; *Smith*, 150 Wn.2d at 484. However, that is not the end of the inquiry.

Liability in a medical malpractice action can be based on negligence too, but our precedent is clear that "the objective symptom requirement is *not* necessary to prove emotional distress damages under chapter 7.70 RCW." *Berger v. Sonneland*, 144 Wn.2d 91, 113, 26 P.3d 257 (2001) (emphasis added). Moreover, Washington

appellate courts have consistently recognized that negligence "and the bad faith standard are distinct theories of liability." *Schmidt v. Coogan*, 181 Wn.2d 661, 676 n.4, 335 P.3d 424 (2014) (Wiggins, J., lead opinion); *see also id.* at 680 n.6 (Fairhurst, J., concurring) (joining the lead opinion's analysis). These distinct theories of liability arise, not necessarily from different *mental states*, but from different *tortfeasors*.

Ordinary negligence can be committed by anyone, but insurance bad faith must be committed by an insurer. *Keodalah*, 194 Wn.2d at 351-53. Unlike ordinary negligent actors, insurers have chosen to enter a highly regulated field "affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters." RCW 48.01.030. Moreover, in a first-party insurance bad faith action like this one, the plaintiff and the defendant necessarily have a preexisting relationship.

Washington precedent recognizes that objective symptomatology is less likely to be required where the parties had a preexisting trust relationship that "is not merely economic, and a reasonable person standing in the defendant's shoes would easily foresee that its breach is likely to cause significant emotional distress." *Price v. State*, 114 Wn. App. 65, 73, 57 P.3d 639 (2002) (adoptive parents suing adoption agency for failure to disclose pertinent information); *see*

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*also Berger*, 144 Wn.2d at 112-13 (medical malpractice). These considerations apply to insurance bad faith actions.

Although the insurer-insured relationship is "something less than a true fiduciary relationship," it has "fiduciary aspects," and may accordingly be described as "'quasi-fiduciary.'" *Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383, 389-90, 823 P.2d 499 (1992); *St. Paul Fire & Marine Ins. Co. v. Onvia, Inc.*, 165 Wn.2d 122, 130 n.3, 196 P.3d 664 (2008). It is also well established that insurance protects both the insured's financial security and their "peace of mind." *Nat'l Sur. Corp. v. Immunex Corp.*, 176 Wn.2d 872, 878, 297 P.3d 688 (2013). Thus, the insured and the insurer have a preexisting trust relationship that is not purely economic, and the noneconomic benefits of insurance make it foreseeable that the insurer's bad faith would cause significant emotional distress to the insured. *Cf. Price*, 114 Wn. App. at 73.

The foreseeability of emotional distress in insurance bad faith is well illustrated by the facts of this case. It is difficult to imagine that any parent would *not* experience emotional distress where insurance bad faith interferes with their child's health care. CP at 2596 (P.E.L.'s mother describing it as "emotionally gruelling and stress levels beyond anything I have ever experienced"). Although each case presents unique circumstances, *every* meritorious insurance bad faith claim arises from an insurer's failure to act reasonably in accordance with its

50

*P.E.L., P.L. & J.L. v. Premera Blue Cross,* No. 101561-5

quasi-fiduciary duty to protect the insured's peace of mind. It is foreseeable that most, if not all, such cases would involve significant emotional distress.

Thus, we affirm the Court of Appeals on this issue and hold that the plaintiffs are not required to produce evidence of objective symptomatology to support their insurance bad faith claim for emotional distress damages.

CONCLUSION

We hold that Premera is entitled to summary judgment on the plaintiffs' action for breach of contract. Premera's alleged violation of *federal* parity laws does not give rise to a viable common law action for breach of contract. The breach of contract action based on Premera's alleged violation of *state* parity laws cannot succeed on the merits based on the former statutory language that applies to this case. Thus, we reverse the Court of Appeals in part and remand the breach of contract action to the trial court for dismissal.

However, we affirm the Court of Appeals in holding that the objective symptomatology requirement does not apply to insurance bad faith actions. In addition, "an insured may maintain an action against its insurer for bad faith investigation of the insured's claim *and violation of the CPA* regardless of whether the insurer was ultimately correct in determining coverage did not exist." *Coventry Assocs.*, 136 Wn.2d at 279 (emphasis added). Therefore, we remand the insurance bad faith and CPA actions to the trial court for further proceedings.

51

P.E.L., P.L. & J.L. v. Premera Blue Cross, No. 101561-5

Yu, J.

WE CONCUR:

González, C.J.

Stephens, J.

Johnson, J.

Gordon McCloud, J.

Madsen, J.

Montoya-Lewis, J.

Owens, J.

Whitener, J.